## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### Austin Division

| | |
|---|---|
| **JONATHAN WALLACE** <br><br> *Plaintiff,* <br><br> v. <br><br> **GREGORY WAYNE ABBOTT, in his official capacity as Governor of the State of Texas;** <br><br> **KEN PAXTON, in his official capacity as Attorney General of Texas; and** <br><br> **FREEMAN F. MARTIN, in his official capacity as Director, Texas Department of Public Safety** <br><br> *Defendants.* | Case No. 1:25-cv-2030 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Jonathan Wallace ("Mr. Wallace") files this Complaint against Defendants GREGORY WAYNE ABBOTT, in his official capacity as Governor of the State of Texas; KEN PAXTON, in his official capacity as Attorney General of Texas; and FREEMAN F. MARTIN, in his official capacity as Director, Texas Department of Public Safety, and alleges as follows:

## I.    INTRODUCTION

1.    This case arises from Texas Governor Greg Abbott's November 18, 2025 proclamation, which purports to designate the Muslim Brotherhood and the Council on American-Islamic Relations ("CAIR") as "foreign terrorist organizations" and "transnational criminal organizations" under Texas law—a designation reserved exclusively to the federal government under 8 U.S.C. § 1189.

2.    By issuing this proclamation, Governor Abbott arrogated to himself a power vested by the Constitution and federal statute exclusively in the U.S. Secretary of State, thereby violating the Supremacy Clause, the First Amendment, the Fourteenth Amendment, and core principles of separation of powers and federalism.

3.    The proclamation triggers severe civil and criminal sanctions under Texas Penal Code § 71.01(e) and Texas Property Code § 5.254(a)(2)(A), subjecting the Muslim Brotherhood, CAIR, and all persons alleged to be "affiliates," "members," or "persons promoting or aiding" their activities to:

     a.    Heightened nuisance-based enforcement and penalties under Chapter 125 of the Texas Civil Practice and Remedies Code;

     b.    Land-ownership prohibitions, divestiture actions, civil penalties, and criminal liability under Subchapter H of Chapter 5 of the Texas Property Code; and

     c.    Investigations by state law enforcement and inclusion in criminal intelligence databases as associates of a "foreign terrorist organization."

4.    The proclamation imposes these disabilities without notice, evidentiary hearing, or any opportunity to be heard—violating procedural due process guarantees embedded in the Fourteenth Amendment and the Fifth Amendment's takings clause as applied through the Fourteenth Amendment.

5.    The designation is explicitly and unapologetically viewpoint- and religion-based, targeting American Muslims while comparable non-Muslim transnational organizations face no comparable state-level designations. The proclamation emphasizes the Muslim Brotherhood's Islamic character and alleged religious goals ("Sharia law," Islam's

"mastership of the world"), demonstrating animus based on religion and viewpoint rather than neutral law enforcement criteria.

6.     Mr. Wallace is a civil rights attorney based in New York with extensive experience representing clients targeted for First Amendment-protected speech. Since October 2023, his practice has focused almost entirely on representing students, faculty, and professionals targeted for pro-Palestinian speech, anti-Zionist advocacy, or membership in Palestinian, Arab, and Muslim communities. In the ordinary course of this practice, Mr. Wallace regularly engages with individuals and organizations that may be characterized as "affiliates" or "members" of the Muslim Brotherhood or CAIR under the proclamation's vague and overbroad definitions. His ability to continue this representation—and to engage in speech and advocacy concerning the Muslim Brotherhood, CAIR, or the rights of Palestinian advocates—is now constrained by the reasonable fear that such conduct will expose him to enforcement action under Texas's proclamation and the statutes it invokes.

7.     Mr. Wallace files this action to: (1) Declare the proclamation unconstitutional and void on its face and as applied; (2) Enjoin Defendants from enforcing, implementing, or giving effect to the designations; (3) Vindicate his First Amendment right to represent clients of his choice, speak freely about the Muslim Brotherhood, and engage in protected advocacy; (4) Protect his Fourteenth Amendment rights to due process and equal protection; and (5) Restore the exclusive federal framework for terrorist designations.

## II.     JURISDICTION AND VENUE

8.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, specifically the First

Amendment, Fourteenth Amendment, Fifth Amendment, Supremacy Clause, Interstate Commerce Clause, and 42 U.S.C. § 1983.

9.      This Court has jurisdiction over claims for declaratory relief under 28 U.S.C. §§ 2201-2202 and over injunctive relief under the principles established in *Ex Parte Young*, 209 U.S. 123 (1908).

10.     This Court has supplemental jurisdiction over Mr. Wallace's state-law claims challenging the proclamation under the Texas Administrative Procedure Act and the Texas Constitution under 28 U.S.C. § 1367, as they arise from the same nucleus of operative fact as the federal constitutional claims.

11.     Personal jurisdiction is proper over all Defendants because:

    a.  Governor Abbott issued the proclamation in his official capacity while residing in Texas and performing governmental duties in Austin, Texas;

    b.  Attorney General Ken Paxton is responsible for enforcing Chapter 125 and Subchapter H of Chapter 5 throughout Texas, including through civil nuisance actions and divestiture proceedings;

    c.  DPS Director Freeman Martin participates in investigations and intelligence database entries concerning the designated entities;

    d.  The proclamation and its effects target activities with foreseeable and substantial connections to Texas—specifically, the proclamation purports to affect land ownership, association, and speech by individuals and organizations nationwide who have connections to Texas or who might travel to or conduct business in Texas;

e.  Defendants are sued in their official capacities and are subject to suit in the forum where their official duties are centered (Austin, Texas); and

f.  Mr. Wallace's injury flows directly from Defendants' official acts.

12.  **Venue** is proper under 28 U.S.C. § 1391(b) because:

a.  A substantial part of the events giving rise to the claims occurred in this District (the proclamation was issued in Austin);

b.  Defendants perform their official duties in this District;

c.  This District is where the proclamation is implemented and enforced; and

d.  Mr. Wallace's injury—the chilling of his First Amendment rights and his ability to represent the Muslim Brotherhood, or those perceived to be affiliated with it under the proclamation's vague and overbroad definition, or conduct protected speech—directly affects his legal practice and constitutional rights as they relate to Texas.

## III.    PARTIES

### A. PLAINTIFF

13.    Jonathan Wallace is a civil rights attorney licensed to practice law in New York (License No. 1733757). He is a resident of Amagansett, New York, where he maintains his law office.

14.    Mr. Wallace is Jewish. He was raised in a Jewish family, attended Hebrew school, and was bar mitzvahed in 1967. He is proud to be of the Judaism of Maimonides, Spinoza, Mendelsohn and Einstein—a tradition that emphasizes reason, universal human dignity, and the inseparability of religious freedom for all faith communities.

15.     This Jewish upbringing instilled in Mr. Wallace the principle that religious liberty is indivisible: the constitutional protections that safeguard his right to practice Judaism must equally protect Muslims, Christians, and people of all faiths. This principle has guided his decades of civil rights work, including his representation of individuals targeted for their Muslim faith or advocacy for Palestinian rights.

16.     Mr. Wallace has spent more than four decades practicing law, with extensive experience in: (a) First Amendment litigation, including cases involving students and faculty targeted for pro-Palestinian speech, Occupy Wall Street activism, and Black Lives Matter advocacy; (b) Civil rights litigation, including Section 1983 cases challenging governmental violations of constitutional rights; (c) Immigration law, particularly asylum proceedings and representation of individuals facing removal; (d) Criminal defense; (e) Commercial litigation in federal courts; and (f) Pro bono work, which currently comprises the entirety of his legal practice following his semi-retirement from paid practice.

17.     Since October 2023, Mr. Wallace has represented students, faculty, and professionals targeted for pro-Palestinian speech, anti-Zionist activism, or membership in Palestinian, Arab, and Muslim communities.

18.     Mr. Wallace has represented numerous individuals affiliated with organizations that advocate for Palestinian rights, including individuals who are members of or sympathetic to organizations that the Proclamation targets. His ongoing practice brings him into regular contact with Muslim communities, Palestinian advocacy organizations, and individuals who may be characterized as "affiliates" or "members" of the Muslim Brotherhood or CAIR under the Proclamation's vague and overbroad definitions.

19.    Mr. Wallace intends to continue representing individuals targeted for pro-Palestinian speech and Muslim advocacy. This representation will inevitably require him to engage with organizations, movements, and individuals that the Proclamation purports to designate as "foreign terrorist organizations" and "transnational criminal organizations."

20.    Mr. Wallace also intends to engage in protected speech concerning the Muslim Brotherhood, CAIR, and the unconstitutionality of the Proclamation. Specifically, he intends to write about the Muslim Brotherhood and CAIR on his blog (The Ethical Spectacle) and on Substack; speak publicly about the unconstitutionality of state-level terrorism designations; organize or participate in seminars, teach-ins, and informational events addressing the Muslim Brotherhood, Palestinian rights, and First Amendment implications; and publish scholarship or advocacy materials addressing these issues.

21.    This intended speech and representation is "arguably proscribed" by the Proclamation, which subjects "any persons promoting or aiding" the Muslim Brotherhood's "criminal activities" to heightened penalties under Chapter 125. The Proclamation's vague language creates genuine uncertainty about whether Mr. Wallace's intended conduct—legal representation, public advocacy, scholarly writing—crosses the line into prohibited "promoting or aiding."

22.    Mr. Wallace reasonably fears enforcement of the Proclamation against him if he engages in this protected conduct. This fear is objectively reasonable because:

    a.    The Proclamation expressly invokes enforcement mechanisms under Chapter 125 and Property Code Subchapter H;

    b.    The Attorney General is empowered to bring nuisance actions and divestiture proceedings;

    c.   Texas has not disavowed enforcement;

    d.   The federal government has characterized similar legal representation as potential "material support" for terrorism (*see Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010));

    e.   The proclamation's inflammatory rhetoric suggests aggressive enforcement posture.

23.    As a direct result of this reasonable fear, Mr. Wallace is currently self-censoring his speech and professional activities. He has declined to publish planned writing about the Muslim Brotherhood; refrained from organizing events addressing the Proclamation's unconstitutionality; limited his public statements about CAIR and Palestinian advocacy; and avoided travel to Texas for professional purposes related to his civil rights practice.

24.    This self-censorship constitutes a concrete, cognizable injury under the First Amendment. The danger of this designation is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution.

## B. DEFENDANTS

25.    **Defendant Gregory Wayne Abbott** is the Governor of the State of Texas, sued in his official capacity. In his official capacity, Governor Abbott issued the November 18, 2025 proclamation designating the Muslim Brotherhood and CAIR as foreign terrorist and transnational criminal organizations. Governor Abbott resides in Austin, Texas, where he exercises official authority over state government, including the Proclamation's implementation and enforcement.

26.    **Defendant Ken Paxton** is the Attorney General of the State of Texas, sued in his official capacity. The Attorney General is responsible for enforcing Chapter 125 of the

Texas Civil Practice & Remedies Code (governing criminal street gang and terrorist organization nuisance actions) and Subchapter H of Chapter 5 of the Texas Property Code (governing transnational criminal organization property seizure). Defendant Paxton is responsible for reviewing and initiating enforcement actions against designated entities and their alleged "affiliates," "members," and "persons promoting or aiding" their activities.

27.    **Defendant Freeman F. Martin** is the Director of the Texas Department of Public Safety, sued in his official capacity. The DPS participates in investigations concerning terrorist designations, provides intelligence to other state and federal law enforcement agencies, and maintains criminal intelligence databases that may include information about individuals designated in connection with terrorist organizations.

## IV.    FACTUAL ALLEGATIONS

### A. THE FEDERAL FOREIGN TERRORIST ORGANIZATION SCHEME

28.    Under 8 U.S.C. § 1189, only the U.S. Secretary of State may designate a Foreign Terrorist Organization ("FTO"), following a detailed administrative process that includes: (a) Specific findings that the organization engages in terrorist activity or terrorism (as defined in federal law); (b) Notice to the designated organization; (c) An opportunity for the organization to present evidence and be heard; and (d) Judicial review in the Court of Appeals for the D.C. Circuit, which may set aside a designation if it is "not supported by substantial evidence."

29.    The federal FTO designation process is designed to provide procedural safeguards, national uniformity, and judicial review—ensuring that designations rest on evidence rather than political whim.

30.    The U.S. State Department's official Foreign Terrorist Organization list, maintained pursuant to 8 U.S.C. § 1189, does not include "the Muslim Brotherhood" as a designated FTO. While the State Department has designated certain organizations described as Brotherhood affiliates (including Hamas), it has explicitly declined to designate the Muslim Brotherhood itself.

31.    Congress has repeatedly considered legislation directing the Secretary of State to designate the Muslim Brotherhood as a terrorist organization, and it has consistently declined to do so.[1] This legislative inaction reflects deliberate federal policy that the Muslim Brotherhood should not receive an FTO designation and confirms that such a designation remains subject to federal deliberation and determination.[2]

32.    Executive branch officials and nonpartisan experts have consistently advised Congress that the Brotherhood does not meet the legal criteria for designation because it is not a monolithic entity and its various manifestations—many of which are legal political parties in allied nations—do not engage in terrorist activity.[3]

_____

[1] *See, e.g.*, *Muslim Brotherhood Terrorist Designation Act of 2015*, H.R. 3892, 114th Cong. (2015) (passed by House Judiciary Committee but never brought to floor vote); *Muslim Brotherhood Terrorist Designation Act of 2017*, S. 68, 115th Cong. (2017) (died in committee); *Muslim Brotherhood Terrorist Designation Act*, S. 419, 117th Cong. (2021) (died in committee).

[2] *See, e.g.*, *The Muslim Brotherhood: Hearing Before the Subcomm. on Terrorism, HUMINT, Analysis, and Counterintelligence of the H. Permanent Select Comm. on Intelligence*, 112th Cong. 1 (2011) (testimony of Nathan Brown, Professor, George Washington Univ.) (stating that "the repudiation of securing change through violence is clear, strategic, and sustained" for Brotherhood movements in countries like Egypt and Jordan); ("[T]he Brotherhood has embraced democracy. It never rejected democracy in principle, but for a long time it distrusted party politics . . . But over the last generation, the Brotherhood's dedication to electoral politics . . . has become consistent and deeply engrained in the movement's appeals.").

[3] *See, e.g.*, *The Muslim Brotherhood's Global Threat: Hearing Before the Subcomm. on Nat'l Sec. of the H. Comm. on Oversight & Gov't Reform*, 115th Cong. 1 (2018) (statement of Amb. Daniel

33.     The federal scheme is comprehensive and exclusive, occupying the entire field of foreign terrorist organization designations. It reflects Congress's judgment that (a) Uniform national standards are essential to foreign affairs and national security; (b) State-level terrorism designations would create chaos, inconsistent application of law, and interference with federal foreign policy; (c) Due process protections and judicial review are necessary safeguards against arbitrary designations; and (d) International relations require a single national voice on terrorism designations.

### B.  The Texas Proclamation and Invoked Statutes

34.     On November 18, 2025, Governor Abbott issued a proclamation ("the Proclamation") designating the Muslim Brotherhood and CAIR as (a) "Foreign Terrorist Organizations" under Texas Penal Code § 71.01(e); and (b) "Transnational Criminal Organizations" under Texas Property Code § 5.254(a)(2)(A).

---

Benjamin) ("As scholars, intelligence analysts and policymakers in past administrations have come to agree, there is no singular, monolithic Muslim Brotherhood . . . [T]here is no central administration linking these disparate groups."); ("[T]he Muslim Brotherhood does not have the first desideratum of being a 'foreign organization.' While many organizations have links to the original Egyptian Muslim Brotherhood, there is no single foreign organization."); *The Muslim Brotherhood: Hearing Before the Subcomm. on Terrorism, HUMINT, Analysis, and Counterintelligence of the H. Permanent Select Comm. on Intelligence*, 112th Cong. 1 (2011) (testimony of Tarek Masoud, Assistant Professor, Harvard Univ.) ("I have interviewed dozens of members of the Brotherhood, studied the history of the movement, and read widely in the writings of its leaders and thinkers . . . [W]hat we know is that the Muslim Brothers have run in every Egyptian election since 1984 . . . [T]he movement's politicians have been, 'some of the region's most vigorous and outspoken proponents of democratic reform.'"); *see also Ted Cruz's Muslim Brotherhood Terrorist Bill*, Bridge Initiative (Jan. 18, 2017) (article by John L. Esposito, Director, Bridge Initiative) (arguing that designation "would deny American policy makers access to an important resource in the war against ISIL" and noting that "[f]or more than 30 years, Muslim Brotherhood associated movements and parties have been a force for democratization and stability in the Middle East").

35.    The Proclamation explicitly invokes enforcement mechanisms that impose serious civil and criminal disabilities:

"(1) 'Designate both the Muslim Brotherhood and its successor organization CAIR as Foreign Terrorist Organizations under Texas Penal Code § 71.01(e), and thereby subject those organizations, and any persons promoting or aiding their criminal activities, to the heightened penalties authorized by Chapter 125 of the Texas Civil Practice and Remedies Code;' and

(2) 'Designate both the Muslim Brotherhood and its successor organization CAIR as Transnational Criminal Organizations and proscribed entities under Texas Property Code § 5.254(a)(2)(A), and thereby subject those organizations, and their affiliates and members, to Chapter 5 of the Texas Property Code, which prohibits them from purchasing or acquiring land in Texas.'"

36.    The Proclamation's rhetoric is explicitly religious and ideological, rather than based on neutral law enforcement criteria. The Proclamation asserts that the Muslim Brotherhood seeks to (a) "Forcibly impose Sharia law"; (b) Establish Islam's "mastership of the world"; and (c) Other ideological objectives.

37.    The Proclamation relies on selectively quoted statements attributed to the Muslim Brotherhood and contested allegations about the movement's history and ideology, rather than specific findings of terrorist conduct in Texas or criminal activity posing a threat to Texas residents, or even anywhere in the United States.

### C. THE PROCLAMATION'S CONFLATION OF PROTECTED ADVOCACY WITH TERRORISM

38.    The Proclamation's designation of the Muslim Brotherhood and CAIR criminalizes broad categories of pro-Palestinian speech and advocacy. By labeling CAIR—a

prominent civil rights organization that advocates for Palestinian rights—as a "terrorist" entity, the Proclamation effectively stigmatizes and legally jeopardizes *all* advocacy for Palestinian rights by associating it with "material support" for terrorism.

39.    The Proclamation explicitly bases its designation of CAIR as a terrorist organization on protected political speech and advocacy related to Palestinian human rights. Specifically, the Proclamation:

    a.    Cites as a primary justification for the designation that CAIR's Executive Director "publicly praised and supported Hamas's October 7, 2023, attack against Israel, saying he 'was happy to see' the assault" (Proclamation at 2-3);

    b.    Condemns CAIR for honoring a "supporter of Hamas" at an "anti-Israel rally in Washington, D.C." (Proclamation at 2);

    c.    Relies on CAIR's alleged connections to Palestinian advocacy groups to justify imposing severe civil and criminal penalties; and

    d.    Frames advocacy for Palestinian rights as inherently suspect, conflating political criticism of Israeli policy with "promoting or aiding" terrorist activity.

40.    This conflation is not accidental but strategic. By citing these specific instances of political speech—statements about foreign conflicts, attendance at rallies, and expressions of solidarity—as the basis for terrorist designation, the Proclamation demonstrates that its true purpose is to suppress criticism of the Zionist occupation and advocacy for Palestinian rights. It signals that anyone who engages in similar speech or advocacy in Texas may be deemed to be "promoting or aiding" a designated terrorist organization.

41.    This explicit reliance on political speech about the Zionist occupation and Palestine creates a direct link between the designation and the suppression of pro-Palestinian

viewpoints. It puts Mr. Wallace and his clients on notice that their advocacy for Palestinian rights—which necessarily involves criticizing Zionist policies and often aligns with viewpoints disfavored by the Governor—may be treated by Texas authorities as evidence of terrorist affiliation or support.

### D. Texas Penal Code § 71.01(e): Definition of "Foreign Terrorist Organization"

42.    Texas Penal Code § 71.01(e) defines "foreign terrorist organization" as:

"Three or more persons operating as an organization at least partially outside the United States who engage in criminal activity and threaten the security of this state or its residents, including but not limited to a drug cartel."

43.    This statute's language is vague, undefined, and lacking in limiting principles: (a) "Criminal activity" is undefined—it could encompass any activity deemed criminal by any jurisdiction; (b) "Threatens the security" is undefined—it could encompass purely expressive activities, association, or ideological advocacy; (c) "This state or its residents" is defined with no limitation to conduct actually occurring in Texas; (d) No requirement exists that the organization have engaged in any conduct in Texas or that Texas residents face any credible threat.

44.    Under this vague and overbroad definition, the Proclamation designates the Muslim Brotherhood and CAIR without (a) Proving that they engage in "criminal activity" as Texas defines that term; (b) Providing any evidence that they "threaten[] the security" of Texas or its residents; (c) Offering any specific findings of conduct in Texas; or (d) Allowing notice or opportunity to be heard.

### E. Texas Property Code § 5.254 and Subchapter H: Land Ownership Prohibitions

45.     Texas Property Code § 5.254(a)(2)(A) authorizes the Governor to designate entities as "proscribed entities" barred from acquiring land in Texas. The statute defines a "proscribed entity" to include:

> "An entity the governor has designated as a foreign terrorist organization, a transnational criminal organization, or a criminal street gang by executive order, proclamation, or rule issued under Section 2306.6726, 5.006, or other applicable law."

46.     Upon designation as a "proscribed entity," Texas Property Code Subchapter H authorizes (a) Investigations into property ownership; (b) *In rem* actions to divest property owned by the designated entity or its affiliates; (c) Receiverships; (d) Civil penalties for violations of the land-ownership ban; and (e) Criminal penalties for individuals who aid proscribed entities in acquiring land.

47.     The term "affiliates" in the Property Code is not defined in the statute cited by the Proclamation. This vagueness allows the state to treat as "affiliates" anyone with any connection to the Muslim Brotherhood or CAIR, including donors, members, sympathizers, researchers, or, as particularly relevant here, attorneys.

### F. Chapter 125 of the Texas Civil Practice & Remedies Code: Criminal Street Gang and Terrorist Organization Nuisance Provisions

48.     Chapter 125 authorizes the state to treat any "criminal street gang or foreign terrorist organization" as a public nuisance and to seek sweeping injunctions restricting Operations of the organization, association among members, use of property for organization-related activities, communications and meetings.

49.     Chapter 125 also authorizes enhanced penalties, including criminal contempt for violation of injunctions.

50.     Recent amendments to Chapter 125 specifically expand these provisions to apply to organizations designated as "foreign terrorist organizations," with enhanced civil penalties and property seizure authority.

51.     The statute contains no limiting principle on what constitutes an "affiliate" or "person promoting or aiding" the organization, thereby exposing a potentially unlimited class of individuals to enforcement action.

### G. ABSENCE OF PROCEDURAL PROTECTIONS

52.     No pre-designation notice or opportunity to be heard was afforded to the Muslim Brotherhood, CAIR, or any U.S.-based supporters before the Proclamation was issued.

53.     No post-designation mechanism exists under Texas law for the Muslim Brotherhood, CAIR, alleged "affiliates" or "members," or First Amendment advocates to challenge the designation, present evidence, or clear their names—a stark contrast to the federal FTO process, which includes notice, an opportunity to submit evidence, and judicial review.

54.     No investigation was conducted by the Governor's office to determine whether the Muslim Brotherhood or CAIR engage in terrorist activity threatening Texas or whether it qualifies as a "foreign terrorist organization" under Texas Penal Code § 71.01(e).

55.     The Proclamation contains no findings regarding (a) What specific "criminal activity" the Muslim Brotherhood or CAIR engage in; (b) How that activity "threatens the security" of Texas or its residents; (c) Why a Texas state-level designation is necessary given

the federal scheme; (d) What evidence supports the designation; or (e) Whether less restrictive alternatives exist.

## V.    EFFECTS ON MR. WALLACE

56.    As a direct result of the Proclamation and the enforcement mechanisms it invokes, Mr. Wallace faces concrete, imminent, and credible threats to his First Amendment and due process rights.

### A. CHILLING OF LEGAL REPRESENTATION

57.    Mr. Wallace's civil rights practice since October 2023 has focused almost entirely on representing students, faculty, and professionals targeted for pro-Palestinian speech, anti-Zionist advocacy, or membership in Palestinian, Arab, and Muslim communities. He has represented approximately 1,200 students and 400 faculty members and other professionals, many of whom are members of or affiliated with organizations that advocate for Palestinian rights.

58.    In the ordinary course of this practice, Mr. Wallace regularly engages with individuals and organizations that may be characterized as "affiliates," "members," or persons "promoting or aiding" the Muslim Brotherhood or CAIR under the Proclamation's vague and overbroad definitions. The Proclamation does not define these terms, leaving Mr. Wallace with no clear notice of what conduct or associations are prohibited.

59.    Mr. Wallace is now constrained from continuing this representation because:

a.    Texas law exposes him to prosecution under Tex. Penal Code § 71.01(e) if his legal representation of clients with any connection to the Muslim Brotherhood or CAIR is characterized as "promoting or aiding" the organization's "criminal activities";

b.  In *Holder v. Humanitarian Law Project*, the Supreme Court upheld the federal material-support statute against a First Amendment challenge, and then-Solicitor General Elena Kagan argued that even filing an amicus brief concerning a designated organization's legal rights could constitute "material support"—suggesting that legal representation poses even greater exposure under Texas's parallel scheme;

c.  If Mr. Wallace maintains any office or property in Texas for purposes of representing clients with connections to targeted organizations, he could be subjected to divestiture proceedings under Property Code Subchapter H;

d.  The reputational damage from state-level terrorism association, combined with the specter of criminal prosecution, creates a reasonable fear that continuing his current practice will destroy his law practice and professional reputation.

60.    This chilling is direct and material. Mr. Wallace has an established practice representing individuals and organizations in communities targeted by the Proclamation. He intends to continue this practice, but reasonably fears that doing so will expose him to enforcement action under Texas law. He is not engaged in hypothetical First Amendment speculation; he is describing the concrete constraints on his ongoing professional work.

**B.  CHILLING OF SPEECH AND ADVOCACY**

61.    Mr. Wallace is constrained from engaging in protected speech and advocacy regarding the Muslim Brotherhood, CAIR, Palestinian rights, and the unconstitutionality of the Proclamation because (a) Texas law could characterize such speech as "promoting or aiding" a designated organization under the Proclamation's expansive and undefined language; (b) Speaking publicly—via press interviews, blog posts, Substack articles, books,

seminars, or teach-ins—about the Muslim Brotherhood, CAIR, or Palestinian advocacy could expose him to enforcement action under Chapter 125 or Property Code Subchapter H; (c) The vague definition of "person promoting or aiding" creates genuine uncertainty about what speech is protected and what crosses into prohibited conduct.

62.    Mr. Wallace wishes to engage in the following protected speech without fear of state prosecution or civil penalty: (a) Speaking to the press and publishing on his blog (*The Ethical Spectacle*, www.spectacle.org) and Substack; (b) Publishing books or articles addressing the Muslim Brotherhood, CAIR, Palestinian rights, or the dangers of state-level terrorism designations; (c) Hosting or organizing seminars, teach-ins, or informational events—in Texas or nationwide—addressing the Muslim Brotherhood, CAIR, federal-state coordination on terrorism designations, or First Amendment implications of the Proclamation; (d) Coordinating with co-counsel and experts in litigation challenging the Proclamation; (e) Advocating for legislative or executive action to rescind the Proclamation or reform Texas law.

63.    As a direct result of the Proclamation, Mr. Wallace has self-censored his speech. He has (a) Declined to publish planned writing about the Muslim Brotherhood, CAIR, and Palestinian advocacy; (b) Refrained from organizing events addressing the Proclamation's unconstitutionality; (c) Limited his public statements about Palestinian rights organizations, and related topics; and (d) Avoided professional activities in Texas that could be characterized as "promoting or aiding" designated organizations.

64.    This self-censorship constitutes a concrete, cognizable injury under the First Amendment. The danger of this designation is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution.

### C. CHILLING OF ASSOCIATION AND TRAVEL

65.    Mr. Wallace is constrained from associating with individuals and organizations in Palestinian, Arab, and Muslim communities in Texas, or traveling to Texas for professional purposes related to his civil rights practice for several reasons.

66.    His presence in Texas in connection with individuals or organizations that could be characterized as "affiliates" or "members" of the Muslim Brotherhood or CAIR could be deemed "promoting or aiding" conduct under Tex. Penal Code § 71.01(e).

67.    If Mr. Wallace maintains property in Texas for professional purposes (office space, meeting facilities, etc.), he could be subjected to divestiture proceedings under Property Code Subchapter H.

68.    The uncertainty about what constitutes actionable conduct creates a pervasive chilling effect on all professional association and travel.

69.    Mr. Wallace has a long history of professional engagement with Texas. He has tried cases in federal courts in Lubbock and Brownsville, spent approximately one week per month in Austin during the 1990s in connection with his work for a national technology company, and once considered moving to Austin. The Proclamation now renders Texas an inhospitable forum for his primary area of legal practice—representation of individuals and communities disfavored by state government.

### D. HARM TO VULNERABLE CLIENTS

70.    Mr. Wallace represents visa holders and foreign nationals who are subject to immigration enforcement. Many of these clients are members of Palestinian, Arab, and Muslim communities targeted by the Proclamation.

71.     Mr. Wallace's continued representation of these clients—and his advocacy on issues related to Palestinian rights, CAIR, and the Muslim Brotherhood—could trigger immigration investigations and enforcement action against his clients, their family members, and related organizations and individuals in his professional network.

72.     This chilling effect operates with particular force on vulnerable populations. The mere threat of immigration consequences deters visa holders and foreign nationals from exercising First Amendment rights, seeking legal representation, or associating with attorneys and organizations that advocate for their interests.

73.     Mr. Wallace's ability to effectively represent these vulnerable clients is materially impaired by the Proclamation, which stigmatizes his practice and creates enforcement risks for anyone associated with it.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 1983
### FIRST AMENDMENT VIOLATION
### (Free Speech and Association)

74.     Mr. Wallace realleges and incorporates by reference paragraphs 1-73 above.

75.     The First Amendment, made enforceable against states through the Fourteenth Amendment, protects:

    a.  Freedom of speech: Including speech about political organizations, advocacy, and criticism of government;

    b.  Freedom of association: Including professional association with clients and voluntary organizations;

    c.  Freedom of petition: Including challenges to governmental action through litigation.

76.    The Proclamation, as implemented through § 71.01(e), Chapter 125, and Property Code Subchapter H, imposes content- and viewpoint-based restrictions on speech and association by: (a) Stigmatizing the Muslim Brotherhood (a Muslim-identified theological movement), CAIR (a Muslim-identified organization), and anyone associated with either as "terrorists" and "criminals"; (b) Explicitly emphasizing the movement and organization's Islamic character and alleged religious goals ("Sharia law," Islam's "mastership of the world"); (c) Targeting speech, association, and representation related to the organization based on its disfavored political and religious viewpoint; and (d) Creating a chilling effect on protected speech through the threat of prosecution and property seizure.

77.    These restrictions burden Mr. Wallace's First Amendment rights by:

a.    Deterring him from representing clients in Palestinian, Arab, and Muslim communities who may be characterized as "affiliates," "members," or persons "promoting or aiding" the Muslim Brotherhood or CAIR under the Proclamation's vague definitions (core First Amendment activity: litigation and legal advocacy);

b.    Deterring him from speaking about the Muslim Brotherhood, CAIR, Palestinian advocacy, or related topics (core First Amendment activity: political speech);

c.    Deterring him from associating with individuals and organizations in communities targeted by the Proclamation (core First Amendment activity: voluntary association);

d.   Deterring him from traveling to or maintaining a professional presence in Texas for purposes of engaging in protected activity related to his civil rights practice;

e.   Rendering it effectively impossible for individuals and organizations in Palestinian, Arab, and Muslim communities—including those affiliated with CAIR or characterized as connected to the Muslim Brotherhood—to engage in protected advocacy in Texas (including fundraising, meetings, publications, advocacy, and association) without fear of enforcement action against themselves or their attorneys.

78.   These restrictions are not narrowly tailored to a compelling government interest and are not the least restrictive means of achieving any legitimate aim because (a) Texas has available all existing federal and state criminal laws to address actual terrorist activity or criminal conduct; (b) The federal FTO designation process already addresses terrorism concerns at the national level; (c) Texas's proclamation is premised on ideological disagreement with the Muslim Brotherhood's goals (Muslims embodying Islam in every facet of their life), not on any specific finding of terrorist conduct in Texas; (d) The designation sweeps in persons engaged purely in protected speech, association, or religious practice; (e) Less restrictive alternatives exist, such as prosecution of actual criminal conduct under existing law; federally coordinated designations; evidence-based findings prior to designation.

79.   The Proclamation is viewpoint discriminatory because (a) It targets a Muslim organization specifically because of its Islamic religious character; (b) Comparable non-Muslim transnational political movements are not subjected to similar state-level designations; and (c) The proclamation's rhetoric explicitly condemns the organization's

religious and ideological goals, demonstrating animus based on religion and viewpoint rather than neutral law enforcement criteria.

80.    The proclamation violates strict scrutiny and, independently, violates the First Amendment's prohibition on content-based and viewpoint-based discrimination.

81.    Mr. Wallace is injured by the chilling of his First Amendment rights to represent clients of his choice, engage in protected advocacy, and associate with disfavored organizations.

82.    Defendants are responsible for these First Amendment violations in their official capacities as state actors charged with enforcing the proclamation and the invoked statutes.

## COUNT II
### 42 U.S.C. § 1983
### FOURTEENTH AMENDMENT
### (Procedural Due Process)

83.    Mr. Wallace realleges and incorporates by reference paragraphs 1-73 above.

84.    The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

85.    Mr. Wallace has liberty interests protected by the Fourteenth Amendment, including (a) Liberty interest in practicing his profession: The liberty to practice law and represent clients; (b) Liberty interest in avoiding stigmatization: The liberty to avoid government-imposed stigmatizing labels ("terrorist," "criminal") that combine with concrete legal disabilities ("stigma plus"); (c) Liberty interest in free association: The liberty to associate with individuals and organizations of his choice; and (d) Liberty interest in free speech and petition: The liberty to engage in protected speech and litigation.

86.    Mr. Wallace has property interests protected by the Fourteenth Amendment, including (a) Existing and prospective property interests in Texas: Any property Mr. Wallace owns or acquires in Texas; (b) Contractual relationships: Existing and prospective business relationships and legal representation relationships; and (c) Professional practice: His law practice and professional reputation.

87.    The Proclamation and invoked statutes impose severe consequences without pre-deprivation process: (a) Land-ownership ban affecting Mr. Wallace's property interests; (b) Enhanced penalties and enforcement authority affecting his liberty interest in practicing law; (c) Stigmatizing "terrorist" and "criminal" labels affecting his reputation and professional standing; and (d) Chilling of representation relationships affecting his contractual and professional interests.

88.    The Proclamation provides no pre-designation notice or opportunity to be heard to the Muslim Brotherhood, CAIR, Mr. Wallace, or any other affected party.

89.    No post-designation mechanism exists for any affected person to challenge the designation, present evidence, or request reconsideration, which constitutes a fundamental failure to provide meaningful due process.

90.    The Proclamation contains no neutral decision-maker requirement: It is issued unilaterally by the Governor, reviewed by no judicial or administrative body, and subject to no appellate review.

91.    More fundamentally, the Proclamation's standards are vague and undefined: "Criminal activity," "threatens the security," "persons promoting or aiding," and "affiliates" are all undefined, leaving Mr. Wallace with no clear notice of what conduct is prohibited.

92.     The availability of less burdensome alternatives demonstrates that the Proclamation's procedures are not minimally necessary: (a) Pre-designation notice and an opportunity to respond; (b) Evidentiary hearing before a neutral decision-maker; and (c) Specific findings of fact regarding terrorist conduct or threat to Texas security; (d) Judicial review; and (e) An opportunity to petition for reconsideration or removal.

93.     Even under a rational-basis standard, the Proclamation fails because (a) It is not rationally related to protecting Texas security (Texas faces no specific threat from the Muslim Brotherhood or CAIR); (b) It violates the "rational basis with teeth" standard applicable to cases involving significant First Amendment or liberty interests; and (c) It sweeps in protected activity that has no conceivable connection to any legitimate state interest.

94.     The proclamation thus violates Mr. Wallace's right to procedural due process under the Fourteenth Amendment.

## COUNT III
### 42 U.S.C. § 1983
### FOURTEENTH AMENDMENT
### (Equal Protection)

95.     Mr. Wallace realleges and incorporates by reference paragraphs 1-73 above.

96.     The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

97.     The Proclamation discriminates on the basis of religion by (a) Targeting the Muslim Brotherhood (a Muslim-identified theological movement), CAIR (a Muslim-identified organization), and anyone associated with either for a designation that comparable non-Muslim organizations do not receive; (b) Explicitly emphasizing the movement and organization's Islamic character ("Sharia law," Islam's "mastership of the world"); (c)

Applying a designation and enforcement regime disproportionately to Muslim advocacy and Muslim organizations; and (d) Singling out religious and ideological viewpoints disfavored by state officials.

98.     The Proclamation discriminates on the basis of viewpoint by (a) Targeting a theological movement and civil rights organization specifically because of their ideological goals (Muslims embodying Islam in every facet of their life); (b) Applying enforcement mechanisms to suppress criticism of the Zionist occupation and advocacy for Palestinian rights (which the Proclamation correlates with support for or advocacy related to the Muslim Brotherhood and CAIR); and (c) Creating a disparate impact on advocates for Palestinian rights and Muslim communities while allowing comparable speech by pro-Zionist advocates.

99.     These classifications trigger strict scrutiny because they implicate religion (designating a Muslim movement and a Muslim organization for ideological rather than criminal reasons), implicate viewpoint (targeting protected political speech and advocacy), and implicate fundamental rights (chilling First Amendment freedoms of speech, association, and petition).

100.    The Proclamation cannot survive strict scrutiny because:

a.   Compelling interest: The state's interest in preventing terrorism is legitimate, but this interest is already addressed by the federal FTO designation process— the state has not articulated a compelling state interest served by a parallel state-level designation;

b.   Narrow tailoring: The Proclamation is not narrowly tailored because it sweeps in protected speech, association, and advocacy; it targets ideological viewpoints

rather than criminal conduct; it provides no procedural safeguards; and it conflicts with the federal scheme;

   c.   Least restrictive means: Less restrictive alternatives exist, including prosecution of actual criminal conduct under existing law.

101.   Even under rational-basis review, the Proclamation fails because (a) The state's articulated rationale (prevention of terrorism) is pretextual—the real motivation is suppression of advocacy for Palestinian rights, Muslim activism, and Muslim practice of Islam; (b) The Proclamation is arbitrary and irrational: it sweeps in an entire global movement and perceived supporters with no individualized findings; it is premised on ideological disagreement rather than criminal conduct; and it contradicts federal policy (Congress has considered and rejected designating the Muslim Brotherhood, and CAIR is a nonprofit civil rights organization registered under U.S. and state laws); and (c) No rational relationship exists between the stated justification (terrorism prevention) and the blanket designation applied without investigation or evidence.

102.   The Proclamation thus violates Mr. Wallace's right to equal protection under the Fourteenth Amendment.

### COUNT IV
### U.S. Const. art. I, § 10
#### BILL OF ATTAINDER

103.   Mr. Wallace realleges and incorporates by reference paragraphs 1-73 above.

104.   The Constitution provides that "no State shall . . . pass any Bill of Attainder" U.S. Const. art. I, § 10, cl. 1.

105.    A bill of attainder is a legislative act that specifies particular individuals or entities, imposes punishment upon them, bypasses judicial proceedings, and reflects *ex post facto* application or deprivation of fundamental fairness.

106.    The Proclamation operates as a bill of attainder by:

a.    Specifying particular entities: The Proclamation specifically names the Muslim Brotherhood and CAIR;

b.    Imposing punishment: The designation imposes severe civil disabilities, including (i) Land-ownership bans and potential divestiture (Property Code Subchapter H); (ii) Enhanced penalties (Chapter 125); (iii) Public stigmatization as "terrorist" and "criminal" organizations; (iv) Investigation and inclusion in law enforcement databases;

c.    Bypassing judicial proceedings: No trial, hearing, opportunity to be heard, or judicial review;

d.    Reflecting fundamental unfairness: The designation is issued without notice, evidence, or neutral decision-maker.

107.    The historical purpose of the Bill of Attainder Clause was to prevent exactly this conduct: executive or legislative condemnation of named entities without judicial process.

108.    The Proclamation thus violates the Bill of Attainder Clause.

### COUNT V
### 42 U.S.C. § 1983
### FEDERAL PREEMPTION
### (Supremacy Clause)

109.    Mr. Wallace realleges and incorporates by reference paragraphs 1-73 above.

110.    Field preemption: Federal law, through 8 U.S.C. § 1189, occupies the field of foreign terrorist organization designations, assigning that authority exclusively to the U.S.

Secretary of State. Congress has deliberately structured a comprehensive federal regime that: (a) Reserves designations to the Secretary of State; (b) Provides specific administrative procedures (notice, opportunity to be heard); (c) Establishes nationally uniform standards; (d) Includes judicial review; and (e) Defines specific legal consequences that flow from designation.

111.    Texas's parallel designation creates a state-level FTO regime, which (a) Conflicts with and contradicts the federal exclusive scheme; (b) Creates confusion about the legal status of the Muslim Brotherhood (federal non-designation vs. state designation); (c) Risks undermining federal foreign policy by suggesting at the state level what the federal government has deliberately declined to do at the national level; (d) Pressures the federal government to act at the national level by creating political pressure through coordinated state action; and (e) Interferes with Congress's ongoing deliberations about whether to direct a federal designation.

112.    Conflict preemption: The Proclamation directly conflicts with federal policy by (a) The federal government's deliberate choice not to designate the Muslim Brotherhood as an FTO; (b) Congress's repeated consideration and rejection of legislation directing such a designation; (c) The Executive Branch's policy determinations regarding the Muslim Brotherhood; and (d) The international relations and foreign policy implications of state-level terrorism designations.

113.    State laws interfering with the Executive's foreign affairs authority are preempted even absent express preemption by statute. The Proclamation impermissibly intrudes on the Executive Branch's exclusive domain over foreign relations and terrorism designations.

114.    A state cannot enact laws that conflict with the Executive Branch's negotiated foreign policy, even if Congress has not expressly preempted the field.

115.    To the extent Texas law purports to create an independent and conflicting foreign terrorist organization regime for the Muslim Brotherhood, it is preempted and invalid under the Supremacy Clause.

**COUNT VI**
**42 U.S.C. § 1983**
**INTERSTATE COMMERCE CLAUSE**

116.    Mr. Wallace realleges and incorporates by reference paragraphs 1-73 above.

117.    The right to interstate travel is a fundamental constitutional right protected by the Dormant Commerce Clause and the Privileges and Immunities Clause.

118.    The Proclamation substantially burdens interstate commerce and the right to travel in several ways.

119.    Mr. Wallace's ability to travel to Texas to represent clients in Palestinian, Arab, and Muslim communities, conduct litigation on their behalf, and engage in professional work related to his civil rights practice is restricted.

120.    His ability to maintain a professional presence in Texas (office, property, meeting space, etc.) for purposes of representing clients who may be characterized as "affiliates" or "members" of designated organizations is restricted.

121.    His ability to engage in protected speech and association in Texas concerning the Muslim Brotherhood, CAIR, Palestinian rights, and related topics is restricted.

122.    Exposing attorneys to criminal and civil liability for representing clients in disfavored communities or engaging in advocacy on disfavored topics creates an artificial barrier to commerce and professional services.

123.    Proscribing activity—advocacy, association, and speech concerning the Muslim Brotherhood, CAIR, and Palestinian rights—that is lawful in all neighboring states and throughout the United States also burdens interstate commerce and the right to travel.

124.    The burden on interstate commerce is severe and unwarranted because (a) No safety or protectionist justification exists for deterring attorneys and advocates from engaging with Palestinian, Arab, and Muslim communities on issues related to the Muslim Brotherhood or CAIR—activity that remains lawful in all other states; (b) Texas has not demonstrated that the Muslim Brotherhood or CAIR poses a credible threat to Texas security warranting restrictions on interstate professional activity; (c) The federal government's deliberate choice not to designate the Muslim Brotherhood at the national level suggests no serious national security threat justifying Texas's independent action; (d) The burden falls disproportionately on out-of-state actors (including Mr. Wallace) and non-residents attempting to travel to Texas or conduct professional business there.

125.    Even if a legitimate local interest existed, the Proclamation is not narrowly tailored because (a) Less restrictive alternatives exist, including prosecution of actual criminal activity under existing Texas and federal law; (b) The federal government has already established comprehensive procedures for addressing foreign terrorism under 8 U.S.C. § 1189; and (c) A blanket designation that sweeps in all "affiliates," "members," and persons "promoting or aiding" the designated organizations is massively overinclusive, capturing protected speech, association, and professional services.

126.    To the extent Texas law purports to restrict interstate commerce through the land-ownership ban, enforcement provisions, and chilling of professional services, it is preempted and invalid under the Interstate Commerce Clause.

## COUNT VII
### Tex. Gov't Code § 2001.035, § 2001.038
### TEXAS ADMINISTRATIVE PROCEDURE ACT AND TEXAS CONSTITUTION

127.    Mr. Wallace realleges and incorporates by reference paragraphs 1-73 above.

128.    The Proclamation is a "rule" under the Texas Administrative Procedure Act ("APA") because (a) It is issued by the Governor, an "agency" or "an officer of an agency" with statewide jurisdiction; (b) It "implements, prescribes, or describes" Texas policy concerning foreign terrorist organizations and transnational criminal organizations; (c) It is generally applicable to persons and entities meeting its criteria, including all "affiliates," "members," and persons "promoting or aiding" the designated organizations; and (d) It has the effect of law, triggering enforcement mechanisms under Chapter 125 and Property Code Subchapter H.

129.    Under Tex. Gov't Code § 2001.003(6)-(7), a "rule" is defined as: "[A] statement of general applicability that implements, interprets, or prescribes law or policy or describes the procedure or practice of an agency."

130.    The Proclamation meets this definition: it designates specific organizations as subject to state law consequences, thereby prescribing policy that applies to all persons and entities—including Mr. Wallace and his clients—who may be characterized as connected to those organizations.

131.    The Proclamation was issued in violation of the Texas APA because the Governor (a) Failed to provide public notice of the proposed designation; (b) Failed to provide an opportunity for public comment to affected individuals, organizations, or the public; (c) Failed to provide reasoned justification for the designation, including any evidentiary basis for concluding that the Muslim Brotherhood or CAIR engages in terrorist

activity threatening Texas; (d) Failed to follow the procedural requirements of § 2001.021 (notice) and § 2001.024 (rulemaking process); and (e) Failed to demonstrate compliance with § 2001.035 requirements for rule adoption.

132.    Under Tex. Gov't Code § 2001.038, this Court may set aside the Proclamation if it is arbitrary, capricious, or not supported by substantial evidence.

133.    The Proclamation is arbitrary and capricious because (a) It is based on vague, conclusory allegations rather than specific factual findings of terrorist conduct in or affecting Texas; (b) It fails to consider less restrictive alternatives, such as prosecution of actual criminal conduct under existing law; (c) It contradicts federal policy and congressional determinations where Congress has repeatedly considered and declined to direct a federal designation of the Muslim Brotherhood; (d) It provides no explanation for why a state-level designation is necessary given the comprehensive federal scheme under 8 U.S.C. § 1189; and (e) It is based on ideological and religious grounds—targeting the organization's Islamic character and advocacy for "Sharia law"—rather than factual findings of terrorist activity in Texas.

134.    The Proclamation independently violates the Texas Constitution, specifically:

a.    Article I, § 6 (free expression): by chilling protected speech concerning the Muslim Brotherhood, CAIR, and Palestinian advocacy;

b.    Article I, § 8 (free exercise of religion): by targeting a Muslim-identified organization based on its religious character and advocacy;

c.    Article I, § 3 (equal rights): by discriminating against individuals in Palestinian, Arab, and Muslim communities;

d.    Article I, § 3a (due course of law): by imposing severe disabilities without adequate procedural protections;

    e.    Article I, § 19 (due process): by depriving Mr. Wallace and others of liberty and property interests without notice or opportunity to be heard;

    f.    Article II, § 1 (separation of powers): by granting the Governor unilateral, unreviewable authority to condemn and punish specific entities and their associates as terrorist and criminal organizations—a function reserved to the legislature and judiciary.

135.    These Texas constitutional provisions independently protect Mr. Wallace's speech, association, and due process rights, and the Proclamation violates them on the same grounds as the federal constitutional claims alleged herein.

## VII.    IRREPARABLE HARM, BALANCE OF EQUITIES, AND PUBLIC INTEREST

136.    Mr. Wallace and individuals in the Palestinian, Arab, and Muslim communities targeted by the Proclamation face irreparable harm for several reasons.

137.    First, chilled First Amendment rights cannot be fully compensated by damages—how does one calculate the value of speech never uttered, advocacy never pursued, or legal representation never provided to clients in need?

138.    Second, reputational injury from association with state-designated "terrorist" and "criminal" organizations is permanent and irreversible—the stigma attaches immediately and persists regardless of the designation's ultimate validity;

139.    Third, property seizure under divestiture proceedings is immediately destructive—once property is divested, the harm cannot be undone through subsequent litigation;

140.    Fourth, criminal prosecution exposes Mr. Wallace to imprisonment and the destruction of his license to practice law—consequences that cannot be remedied by damages even if he ultimately prevails;

141.    Finally, ongoing enforcement creates a continuing chill that damages Mr. Wallace's practice and professional relationships—clients in targeted communities are deterred from seeking representation, and colleagues are deterred from associating with his practice.

142.    The balance of equities strongly favors preliminary and permanent injunctive relief because Texas remains fully authorized to prosecute any actual criminal conduct under existing Texas Penal Code provisions—the injunction would not impair legitimate law enforcement.

143.    Additionally, the federal government retains exclusive authority under 8 U.S.C. § 1189 to designate foreign terrorist organizations if it determines such designations are warranted—Texas need not fill any gap in federal enforcement.

144.    The injunction would also prevent only the unlawful state-level parallel designation and its enforcement mechanisms, not prosecution of genuine criminal activity;

145.    The harm to Defendants from enjoining enforcement of an unconstitutional proclamation is nonexistent as they have no legitimate interest in enforcing unconstitutional restrictions. Conversely, the harm to Mr. Wallace from continued enforcement is severe and irreparable.

146.    Defendants face no cognizable injury from being prevented from violating the Constitution.

147.    The public interest is strongly served by (a) Upholding constitutional protections against viewpoint discrimination, religious targeting, and First Amendment infringement; (b) Preventing arbitrary and discriminatory governmental action based on religious animus and ideological disagreement; (c) Maintaining a coherent and federally controlled foreign-terrorism designation scheme that Congress, the Executive Branch, and the courts have carefully established to balance national security with civil liberties; (d) Protecting the integrity of the legal profession by ensuring that attorneys can represent clients of their choice—including clients in disfavored communities—without fear of state prosecution or professional destruction; and (e) Preventing erosion of separation of powers and federalism by ensuring states do not arrogate to themselves authority over foreign affairs and terrorism designations that the Constitution reserves to the federal government.

## VIII.    PRAYER FOR RELIEF

Plaintiff Jonathan Wallace requests that this Court:

A.    Declare that the November 18, 2025 Proclamation designating the Muslim Brotherhood and CAIR as "Foreign Terrorist Organizations" and "Transnational Criminal Organizations" under Texas law is unconstitutional and void on its face and as applied, in violation of the First Amendment, the Fourteenth Amendment (Due Process Clause), the Fourteenth Amendment (Equal Protection Clause), the Bill of Attainder Clause, the Supremacy Clause, and the Interstate Commerce Clause.

B.    Declare that the Proclamation constitutes an invalid "rule" adopted in violation of the Texas Administrative Procedure Act and is void and of no effect.

C.    Declare that Defendants' enforcement of the Proclamation violates Mr. Wallace's First and Fourteenth Amendment rights.

D.    Immediately enjoin and restrain Defendants, their officers, employees, and agents, and all persons acting in concert with them, from:

- Enforcing, implementing, or otherwise giving effect to the Proclamation's designations of the Muslim Brotherhood and CAIR as "foreign terrorist organizations" or "transnational criminal organizations";

- Treating the Muslim Brotherhood, CAIR, or any person alleged to be an "affiliate," "member," or "person promoting or aiding" their activities as a "foreign terrorist organization" or "transnational criminal organization" by virtue of the Proclamation;

- Initiating, pursuing, or maintaining any nuisance action, divestiture action, civil penalty action, or criminal prosecution based on those designations;

- Referring any person to criminal investigation based on alleged association with the Muslim Brotherhood or CAIR pursuant to the Proclamation;

- Maintaining or updating any criminal intelligence database entry based on the Proclamation;

- Otherwise giving effect to the Proclamation in any respect;

E.    Order Defendants to rescind the Proclamation and remove it from public websites, records, and state communications.

F.    Award Mr. Wallace reasonable attorneys' fees and costs under 42 U.S.C. § 1988, the Texas Administrative Code, and other applicable authority.

G.    Award such other and further relief as this Court deems just, proper, and necessary to remedy the constitutional violations alleged herein.

## IX.    JURY DEMAND

Mr. Wallace demands a jury trial on all claims triable to a jury.

Respectfully submitted,

| | |
|---|---|
| _/s/Abdel-Rahman Hamed_ | _/s/ Jonathan Wallace_ |
| ABDEL-RAHMAN HAMED, ESQ. | JONATHAN WALLACE, ESQ. * |
| TXWD Bar No. 1632130 | NY Bar No. 1733757 |
| **Hamed Law** | P.O. Box 728 |
| P.O. Box 25085 | Amagansett, NY 11930 |
| Washington, D.C. 20027 | |
| (202) 888-8846 | (917) 359-6234 |
| Advocates@HamedLaw.com | jonathan.wallace80@gmail.com |

_Attorneys for Plaintiff Jonathan Wallace_

_*Pro hac vice forthcoming_