**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
Austin Division**

|  |  |
|---|---|
| JONATHAN WALLACE<br><br>*Plaintiff*,<br>v.<br><br>**GREGORY WAYNE ABBOTT, in his official capacity as Governor of the State of Texas;**<br><br>**KEN PAXTON, in his official capacity as Attorney General of Texas; and**<br><br>**FREEMAN F. MARTIN, in his official capacity as Director, Texas Department of Public Safety**<br><br>*Defendants*. | Case No. 1:25-cv-2030-DAE<br><br>HON. DAVID A. EZRA |

**FIRST AMENDED COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Jonathan Wallace ("Mr. Wallace") files this Complaint against Defendants GREGORY WAYNE ABBOTT, in his official capacity as Governor of the State of Texas; KEN PAXTON, in his official capacity as Attorney General of Texas; and FREEMAN F. MARTIN, in his official capacity as Director, Texas Department of Public Safety, and alleges as follows:

## I.    INTRODUCTION

1.    This case arises from Texas Governor Greg Abbott's November 18, 2025 proclamation, which purports to designate the Muslim Brotherhood and the Council on American-Islamic Relations ("the Designated Entities") as "foreign terrorist organizations" and "transnational criminal organizations" under Texas law—a designation reserved exclusively to the federal government under 8 U.S.C. § 1189.

2.     In announcing the Proclamation, Governor Abbott explicitly framed the designation in religious terms, stating: "The Muslim Brotherhood and CAIR have long made their goals clear: to forcibly impose Sharia law and establish Islam's 'mastership of the world.'" This religious framing—invoking "Sharia law" and Islam's global aspirations—confirms that the Proclamation targets religious belief and practice, not criminal conduct.[1]

3.     By issuing this proclamation, Governor Abbott arrogated to himself a power vested by the Constitution and federal statute exclusively in the U.S. Secretary of State, violating the Supremacy Clause, the First Amendment, the Fourteenth Amendment, and core principles of separation of powers and federalism.

4.     The proclamation triggers severe civil and criminal sanctions under Texas Penal Code § 71.01(e) and Texas Property Code § 5.254(a)(2)(A), subjecting the Designated Entities and all persons alleged to be "affiliates," "members," or "persons promoting or aiding" their activities to:

    a. Heightened nuisance-based enforcement and penalties under Chapter 125 of the Texas Civil Practice and Remedies Code, which authorizes the Attorney General, district attorneys, county attorneys, city attorneys, and private citizens to sue to enjoin public nuisances constituted by "foreign terrorist organizations."

    b. Land-ownership prohibitions, divestiture actions, civil penalties, and criminal liability under Subchapter H of Chapter 5 of the Texas Property Code, which

---

[1] Press Release, Office of the Tex. Governor, Governor Abbott Designates Muslim Brotherhood, CAIR As Foreign Terrorist Organizations (Nov. 18, 2025).

prohibits designated entities and their affiliates from acquiring real property in Texas.

    c.    Investigations by state law enforcement and mandatory inclusion in criminal intelligence databases maintained by DPS under Texas Code of Criminal Procedure Chapter 67 and Texas Government Code § 421.003, which designates DPS as "the repository in this state for the collection of multijurisdictional criminal intelligence information that is about terrorist activities or otherwise related to homeland security activities" and "the state agency that has primary responsibility to analyze and disseminate that information.

5.    The proclamation imposes these disabilities without notice, evidentiary hearing, or any opportunity to be heard—violating procedural due process guarantees embedded in the Fourteenth Amendment and the Fifth Amendment's takings clause as applied through the Fourteenth Amendment.

6.    The designation is explicitly and unapologetically viewpoint- and religion-based, targeting American Muslims while comparable non-Muslim transnational organizations face no comparable state-level designations. The proclamation emphasizes the Designated Entities' Muslim character and alleged religious goals ("Sharia law," Islam's "mastership of the world"), demonstrating animus based on religion and viewpoint rather than neutral law enforcement criteria.

7.    Mr. Wallace is a civil rights attorney based in New York with extensive experience representing clients targeted for First Amendment-protected speech. Since October 2023, his practice has focused almost entirely on representing students, faculty, and

professionals targeted for pro-Palestinian speech, anti-Zionist advocacy, or membership in Palestinian, Arab, and Muslim communities. In the ordinary course of this practice, Mr. Wallace regularly engages with individuals and organizations that may be characterized as "affiliates" or "members" of the Designated Entities under the proclamation's vague and overbroad definitions. His ability to continue this representation—and to engage in speech and advocacy concerning the Designated Entities or the rights of Palestinian advocates and their associates—is now constrained by the reasonable fear that such conduct will expose him to enforcement action under Texas's proclamation and the statutes it invokes.

8. Mr. Wallace brings this action solely in his individual capacity and solely to vindicate his own constitutional rights. He does not bring this action on behalf of the Designated Entities or any third party. He does not seek relief that runs to those organizations. He brings this action because the Proclamation unconstitutionally restricts *his* speech, *his* professional practice, *his* right to freely travel to and within Texas, and *his* ability to represent clients without state interference in his professional judgments. His standing rests entirely on injuries to himself. Specifically, Mr. Wallace intends to travel to Austin, Texas for the full month of September 2026, during which he will write, demonstrate, agitate, teach, hold conferences, picket the Texas State Capitol, and otherwise publicly challenge this unlawful Proclamation and Texas's official Islamophobia. The Proclamation arguably proscribes each of these activities. This action is brought, in part, to obtain pre-enforcement relief eliminating the unconstitutional threat before he arrives.

9. Mr. Wallace files this action to: (1) Declare the proclamation unconstitutional and void on its face and as applied; (2) Enjoin Defendants from enforcing, implementing, or giving effect to the designations; (3) Vindicate his First Amendment right to represent clients

of his choice, associate and speak freely about the Designated Entities, and engage in protected advocacy; (4) Protect his Fourteenth Amendment rights to due process and equal protection; and (5) Restore the exclusive federal framework for terrorist designations.

## II.    JURISDICTION AND VENUE

10.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, specifically the First Amendment, Fourteenth Amendment, Fifth Amendment, Supremacy Clause, Interstate Commerce Clause, and 42 U.S.C. § 1983.

11.    This Court independently has equitable jurisdiction over Mr. Wallace's federal preemption claim under the Supremacy Clause, U.S. Const. art. VI, cl. 2, as an exercise of this Court's inherent equitable power to enjoin state action preempted by federal law—an implied cause of action.

12.    This Court has jurisdiction over claims for declaratory relief under 28 U.S.C. §§ 2201-2202 and over injunctive relief under the principles established in *Ex Parte Young*, 209 U.S. 123 (1908).

13.    Defendant Abbott is a proper *Ex parte Young* defendant because: (a) Texas Property Code § 5.254(a)(2)(A) specifically vests in the Governor—and no other official—the sole statutory power to designate entities as Transnational Criminal Organizations subject to the land-ownership prohibitions in Subchapter H, and only the Governor can rescind that designation at its source; (b) The designation power under § 5.254(a)(2)(A) is a non-delegable, statute-specific duty assigned exclusively to the Governor by name; (c) The designation creates immediate legal consequences without any intervening enforcement act—the land-ownership prohibition (§ 5.253), criminal penalties (§ 5.258), and civil penalties (§ 5.259)

attach automatically upon designation. The Proclamation's disabilities are also self-executing. The legal status of 'Foreign Terrorist Organization' and 'Transnational Criminal Organization' exists solely because Abbott exercised § 5.254(a)(2)(A)—no other official can create or eliminate that status. This distinguishes promulgation (issuing an order) from creation of legal status (designating entities with automatic disabilities). *See Book People, Inc. v. Wong*, 91 F.4th 318, 335 (5th Cir. 2024) (official proper where he has the duty to enforce the statute in question and a demonstrated willingness to exercise that duty); (d) Abbott has demonstrated a particularized willingness to maintain the designation through multiple affirmative acts: issuing the Proclamation on November 18, 2025; consulting with DPS and the Homeland Security Council as required by § 5.254; directing DPS to open criminal intelligence investigations pursuant to Texas Code of Criminal Procedure Article 67.051; and declining to rescind following commencement of this litigation. While the Fifth Circuit has held that general executive authority is insufficient for *Ex parte Young* standing, this case presents the narrow exception recognized in *Book People, Inc.*, where an official's statute-specific, non-delegable duty that creates direct legal consequences satisfies the enforcement-connection requirement.

14.    Defendants Abbott, Paxton, and Martin are each proper *Ex parte Young* defendants because each holds a particular duty to enforce specific provisions of the challenged statutory scheme and has demonstrated a willingness to exercise that duty. *See City of Austin v. Paxton*, 943 F.3d 993, 1001 (5th Cir. 2019); *Book People, Inc.*, 91 F.4th at 327.

15.    **Defendant Abbott** is a proper defendant not merely because he issued the Proclamation, but because he retains ongoing authority to command enforcement of the designations. Even a lawsuit Texas filed to enforce the Proclamation (*infra* ¶ 17) acknowledges

that "the Governor has issued a Proclamation. Once issued, the Attorney General has the authority to enforce the Governor's proclamation." Tex. Petition ¶ 102. This confirms Abbott's designation is the source of enforcement authority—and only Abbott can rescind it at its source. Texas Property Code § 5.254(a)(2)(A) vests exclusively in the Governor the power to designate and rescind Transnational Criminal Organization status—a power Abbott exercised on November 18, 2025. Critically, Abbott has actively commanded enforcement beyond mere issuance: (1) the Proclamation's recitals state Abbott "consulted with the Director of the Texas Department of Public Safety and the Homeland Security Council as directed by Texas Property Code § 5.254"—an affirmative supervisory act; (2) on or about November 18–19, 2025, Abbott directed DPS to open criminal intelligence investigations into organizations identified in the Proclamation pursuant to Texas Code of Criminal Procedure Article 67.051; (3) Abbott has not rescinded the Proclamation despite having exclusive statutory authority to do so under § 5.254(a)(2)(A); and (4) Attorney General Paxton's February 5, 2026 enforcement lawsuit was filed at Abbott's direction following his designations. These affirmative acts constitute compulsion and constraint sufficient to satisfy *Ex parte Young* under *Book People*, 91 F.4th at 335.

16.     Ongoing authority distinguishes this case from *United States v. Abbott*. In *United States v. Abbott*, 85 F.4th 328 (5th Cir. 2023), the Governor was found to be an improper defendant because the executive order vested enforcement discretion entirely in DPS with 'no ongoing authority' reserved to the Governor. *Id.* at 336. Here, by contrast, Governor Abbott retains ongoing authority that satisfies *Ex parte Young*: (a) Exclusive Rescission Power: Only Abbott can rescind the designations under § 5.254(a)(2)(A)—no other official has this authority; (b) Continuing Legal Effect: The designations create ongoing disabilities that

persist without further action; (c) Affirmative Enforcement Acts: Abbott directed DPS investigations, consulted with Homeland Security Council, and prompted the February 5, 2026 lawsuit by the Texas Attorney General; (d) Failure to Rescind: Abbott has declined to rescind the Proclamation despite this litigation, demonstrating ongoing willingness to maintain the designations. These facts distinguish this case from *Abbott* and satisfy the 'compulsion or constraint' requirement recognized in *Book People*, 91 F.4th at 335.

17.     **Defendant Paxton** is a proper defendant because Texas Property Code § 5.255 vests exclusively in the Attorney General the duty to investigate and initiate in rem divestiture actions, and Texas Civil Practice & Remedies Code § 125.064 authorizes the Attorney General to bring nuisance actions against designated entities. Critically, Attorney General Paxton has demonstrated willingness to exercise this authority through the February 5, 2026 enforcement lawsuit filed in Collin County District Court, *The State of Texas v. Muslim Brotherhood, et al.*, Case No. 471-00734-2026. The State's petition expressly acknowledges that "Once issued, the Attorney General has the authority to enforce the Governor's proclamation" and seeks "temporary and permanent injunctive relief prohibiting all Defendants from engaging in any activities within the State of Texas." Tex. Petition ¶¶ 79, 102-103, Prayer ¶ VI(b)-(d). This is not a hypothetical threat—it is active, ongoing enforcement. *See Woodlands Pride v. Paxton*, 168 F.4th 293, 305 n.10 (5th Cir. 2026) (Attorney General proper defendant where statute grants "sole authority" to recover civil penalties and obtain injunctions). The February 5 lawsuit confirms that Paxton is actively enforcing the Proclamation's designations against the very organizations Wallace associates with professionally.

18.     **Defendant Martin** is a proper defendant because Texas Code of Criminal Procedure Article 67.052 imposes a mandatory duty on DPS to "establish an intelligence database" and maintain all information received from reporting agencies "in accordance with the criminal intelligence systems operating policies established under 28 C.F.R. Section 23.1 et seq. and the submission criteria under Article 67.054(b)." Article 67.051 requires local law enforcement agencies in municipalities of 50,000 or more or counties of 100,000 or more to compile and maintain local intelligence databases on criminal street gangs and foreign terrorist organizations and send that information to DPS. Article 67.054 establishes submission criteria requiring either a judicial finding of participation, a judicial self-admission of membership, or any two of eight enumerated forms of evidence before information may be entered. Defendant Martin oversees DPS's Bureau of Intelligence and has authority to direct the inclusion or removal of individuals and organizations from the statewide criminal intelligence database. Information in the database is confidential under Article 67.101, and unauthorized release is a Class A misdemeanor. These mandatory statutory duties constitute compulsion and constraint sufficient to satisfy *Ex parte Young* under *Book People*, 91 F.4th at 335.

19.     *Ex Parte Young* **Enforcement Connection.** This Court has jurisdiction over Defendants under the *Ex parte Young* exception to Eleventh Amendment sovereign immunity because each Defendant has a particular duty to enforce specific provisions of the challenged statutory scheme and has demonstrated a willingness to exercise that duty. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908); *City of Austin*, 943 F.3d at 1001; *Book People, Inc.*, 91 F.4th at 327. The analysis is provision-specific: Defendant Abbott holds designation and rescission authority under Texas Property Code § 5.254(a)(2)(A); Defendant Paxton holds civil

enforcement authority under Texas Property Code § 5.255 and Texas Civil Practice & Remedies Code § 125.064; and Defendant Martin holds mandatory database maintenance duties under Texas Code of Criminal Procedure Articles 67.051–67.054 and Government Code § 421.003. Each Defendant has demonstrated willingness to exercise these duties through affirmative acts including the November 18, 2025 Proclamation, DPS investigation directives, and the February 5, 2026 enforcement lawsuit. The Eleventh Amendment does not bar this action because it seeks prospective injunctive relief against state officials who have a particular duty to enforce the challenged statutory provisions and have demonstrated a willingness to exercise that duty.

20.    Importantly, all three named defendants are critical to providing complete relief in this case. With respect to Governor Abbot,  the designation itself—the source of Plaintiff's injury—can only be rescinded by the Governor. An injunction against the Attorney General or DPS Director would restrain enforcement proceedings but would leave the designation intact as a valid Texas state instrument. *See Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021) (courts may enjoin officials with actual enforcement mechanisms, but relief must be tailored to stop ongoing constitutional violations). For this reason, Governor Abbott is a necessary defendant, and the Court should retain him to provide complete relief.

21.    This Court has supplemental jurisdiction over Mr. Wallace's state-law claims challenging the proclamation under the Texas Administrative Procedure Act and the Texas Constitution under 28 U.S.C. § 1367, as they arise from the same nucleus of operative fact as the federal constitutional claims.

22. Personal jurisdiction is proper over all Defendants because:

   a. Governor Abbott issued the proclamation in his official capacity while residing in Texas and performing governmental duties in Austin, Texas;

   b. Attorney General Ken Paxton holds exclusive statutory authority under Texas Property Code § 5.255 to investigate and initiate divestiture proceedings under Subchapter H, and shares authority under Texas Civil Practice & Remedies Code § 125.064 to bring Chapter 125 nuisance actions against designated entities;

   c. DPS Director Freeman Martin holds mandatory statutory duty under Texas Code of Criminal Procedure Article 67.052 to establish and maintain the statewide criminal intelligence database for foreign terrorist organizations, and under Article 67.051 to receive and compile information from local law enforcement agencies concerning designated entities;

   d. The proclamation and its effects target activities with foreseeable and substantial connections to Texas—specifically, the proclamation purports to affect land ownership, association, and speech by individuals and organizations nationwide who have connections to Texas or who might travel to or conduct business in Texas;

   e. Defendants are sued in their official capacities and are subject to suit in the forum where their official duties are centered (Austin, Texas); and

   f. Mr. Wallace's injury flows directly from Defendants' official acts.

23. Venue is proper under 28 U.S.C. § 1391(b) because:

a. A substantial part of the events giving rise to the claims occurred in this District (the proclamation was issued in Austin);

b. Defendants perform their official duties in this District;

c. This District is where the proclamation is implemented and enforced; and

d. Mr. Wallace's injury—the chilling of his First Amendment rights and his ability to represent the Muslim Brotherhood, or those perceived to be affiliated with it under the proclamation's vague and overbroad definition, or conduct protected speech—directly affects his legal practice and constitutional rights as they relate to Texas.

## III.   PARTIES

### A. PLAINTIFF

24.     Jonathan Wallace is a civil rights attorney licensed to practice law in New York (License No. 1733757). He is a resident of Amagansett, New York, where he maintains his law office.

25.     Mr. Wallace is Jewish. He was raised in a Jewish family, attended Hebrew school, and was bar mitzvahed in 1967. He is proud to be of the Judaism of Maimonides, Spinoza, Mendelsohn and Einstein—a tradition that emphasizes reason, universal human dignity, and the inseparability of religious freedom for all faith communities.

26.     This Jewish upbringing instilled in Mr. Wallace the principle that religious liberty is indivisible: the constitutional protections that safeguard his right to practice Judaism must equally protect Muslims, Christians, and people of all faiths. This principle has guided his decades of civil rights work, including his representation of individuals targeted for their Muslim faith or advocacy for Palestinian rights.

27.    Mr. Wallace has spent more than four decades practicing law, with extensive experience in: (a) First Amendment litigation, including cases involving students and faculty targeted for pro-Palestinian speech, Occupy Wall Street activism, and Black Lives Matter advocacy; (b) Civil rights litigation, including Section 1983 cases challenging governmental violations of constitutional rights; (c) Immigration law, particularly asylum proceedings and representation of individuals facing removal; (d) Criminal defense; (e) Commercial litigation in federal courts; and (f) Pro bono work, which currently comprises the entirety of his legal practice following his semi-retirement from paid practice.

28.    Since October 2023, Mr. Wallace has represented students, faculty, and professionals targeted for pro-Palestinian speech, anti-Zionist activism, or membership in Palestinian, Arab, and Muslim communities.

29.    Mr. Wallace currently represents plaintiffs and defendants in multiple active federal civil rights actions involving clients in Palestinian, Arab, and Muslim communities—many of whom arguably fall within the Proclamation's (admittedly vague) ambit. In connection with these representations, Mr. Wallace has engaged in Texas-related professional activities including: (a) obtaining pro hac vice admission in the Western District of Texas; (b) conducting client conferences with Texas-resident clients; (c) filing pleadings in the Western District of Texas; and (d) maintaining professional relationships with Texas-licensed co-counsel. These activities are not prospective or speculative—they are existing, ongoing professional obligations that predate the Proclamation and have been directly disrupted by it. Texas-based co-counsel on several matters is currently assessing these co-counsel relationships as a result of Mr. Wallace's associations under Defendant Abbott's Proclamation.

30.    The Proclamation chills Mr. Wallace's ability to continue these representations—by making it legally risky to represent clients who are characterized as "affiliates" or "members" or as persons "promoting or aiding" the Designated Entities' criminal activities—it threatens the legal viability of existing property interests that already belong to Mr. Wallace as a matter of state law, independent of any future purchase or lease of Texas real estate.

31.    Mr. Wallace had taken concrete preparatory steps toward establishing a dedicated professional presence in Texas in connection with his expanding civil rights practice representing clients with perceived connections to the Designated Entities, including: (a) identifying office and conference space in Austin, Texas; (b) retaining Texas-licensed co-counsel and entering cost-sharing agreements for shared professional facilities; (c) scheduling client intake meetings at Texas locations; and (d) applying for and obtaining pro hac vice admission in Texas for purposes of these representations. Following the Proclamation's issuance, Mr. Wallace suspended or modified each of these steps, forgoing professional opportunities already in progress.

32.    As a result, Mr. Wallace gave up sums already expended and professional opportunities already in progress. This is not an allegation of future intention—it is an allegation of present disruption of an existing, concrete plan supported by preparatory acts that had already been taken. Pre-enforcement injury is sufficient where the plaintiff has engaged in a course of conduct arguably affected with a constitutional interest and has concrete plans to engage in the targeted conduct. Mr. Wallace need not expose himself to actual arrest or prosecution when there exists a credible threat that challenged law will be applied to him.

33.    The Proclamation designates the Designated Entities as "foreign terrorist organizations" and "transnational criminal organizations." Under the Proclamation's express language, any person "promoting or aiding" the Designated Entities' "criminal activities" is subject to heightened civil penalties and potential prosecution under Chapter 125.

34.    Every brief Mr. Wallace files in cases alongside co-counsel from the Designated Entities, every court appearance he makes, and every co-counsel communication he sends or receives with attorneys from the Designated Entities is conduct that the Proclamation's vague and overbroad language will arguably characterize as "promoting or aiding" a designated terrorist organization.

35.    Mr. Wallace does not accept that characterization and will continue to zealously represent his clients and maintain his personal and professional associations—including individuals perceived by Texas as associated to the Designated Entities. But the injury to his ongoing practice from this Proclamation is not speculative—it is current, concrete, and traceable directly to Defendants' official acts. Mr. Wallace brings this action solely to vindicate his own constitutional rights. He has standing based on the direct chilling of his own speech, his own professional practice, his own travel to Texas, and his own associational rights. He does not assert the rights of any third party.

36.    Mr. Wallace has represented numerous individuals affiliated with organizations that advocate for Palestinian rights, including individuals who are members of or sympathetic to organizations that the Proclamation targets. His ongoing practice brings him into regular contact with and proudly associates him with Muslim communities, Palestinian advocacy organizations, and individuals who are arguably characterized as

"affiliates" or "members" of the Designated Entities under the Proclamation's vague and overbroad definitions.

37.   Mr. Wallace also has paused engaging in protected speech concerning the Designated Entities and the unconstitutionality of the Proclamation. Specifically, he is ready to publish an article about the Designated Entities on his blog (The Ethical Spectacle) and on Substack; speak publicly about the unconstitutionality of state-level terrorism designations; organize and participate in seminars, teach-ins, and informational events addressing the Muslim Brotherhood, Palestinian rights, and First Amendment implications; and publish scholarship and advocacy materials addressing these issues.

38.   Mr. Wallace intends to continue representing individuals targeted for pro-Palestinian speech and Muslim advocacy. This representation requires him to continue engaging organizations, movements, and individuals that the Proclamation purports to designate as "foreign terrorist organizations" and "transnational criminal organizations."

39.   Most concretely, Mr. Wallace has made concrete, non-refundable arrangements to travel to Austin, Texas for the full month of September 2026. Specifically: (a) Mr. Wallace booked round-trip airfare from New York to Austin in September 2026; (b) Mr. Wallace is currently searching for office space in Austin for the September 2026 period; (c) Texas-based co-counsel on several matters is currently assessing co-counsel relationships as a result of Mr. Wallace's associations under Defendant Abbott's Proclamation; (d) Mr. Wallace is currently working on a schedule of public teach-ins on the First Amendment and the unconstitutional designation of the Muslim Brotherhood. These are not abstract aspirations. They are specific, concrete plans with financial commitments that have already been made in the case of the travel. The Proclamation creates a credible and immediate threat

that any of these activities could be characterized by Texas law enforcement as 'promoting or aiding' a designated foreign terrorist organization.

40.    This intended speech and representation is arguably proscribed by the Proclamation, which subjects "any persons promoting or aiding" the "criminal activities" of Designated Entities to heightened penalties under Chapter 125. The Proclamation's vague language creates genuine uncertainty about whether Mr. Wallace's intended conduct—legal representation, public advocacy, scholarly writing—crosses the line into prohibited "promoting or aiding."

41.    Mr. Wallace reasonably fears enforcement of the Proclamation against him for engaging in this protected conduct. This fear is objectively reasonable because:

   a. The Proclamation expressly invokes enforcement mechanisms under Chapter 125 and Property Code Subchapter H;

   b. The Attorney General is empowered to bring nuisance actions under Texas Civil Practice & Remedies Code Chapter 125 and divestiture proceedings under Texas Property Code Subchapter H;

   c. Texas Attorney General opinions have confirmed that DPS gang database information under CCP Article 67.101 is exempt from public disclosure. Mr. Jeffrey C. Monk, Tex. Atty. Gen. Op. OR2020-08596 (Tex.A.G., 2020); Mr. Brian Riemenschneider, Tex. Atty. Gen. Op. OR2025-26176 (Tex.A.G., 2025). This means Mr. Wallace may be entered into a criminal intelligence database without his knowledge and without any public accountability;

   d. Texas Government Code §§ 418.176 and 418.177 render confidential information collected, assembled, or maintained for the purpose of preventing,

detecting, responding to, or investigating an act of terrorism or related criminal activity when such information relates to staffing requirements or tactical plans (§ 418.176) or to risk/vulnerability assessments (§ 418.177). Tex. Att'y Gen. Op. OR2021-05925 (Tex.A.G., 2021). The practical effect is that the DPS guidance on implementing the Proclamation is likely protected from public disclosure.

e. The Texas Fusion Center's gang section is specifically required by Texas Government Code § 421.082 to annually submit a report to the governor and legislature assessing the threat posed statewide by criminal street gangs—and DPS, along with the attorney general, TDCJ, other law enforcement agencies, and juvenile justice agencies, must provide gang-related information to that section upon request. All information received, stored, analyzed, or disseminated by the fusion center must comply with 28 C.F.R. Part 23. TX GOVT § 421.082.

f. Texas has not disavowed enforcement;

g. The federal government has characterized similar legal representation as potential "material support" for terrorism (*see Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010));

h. The federal government's January 13, 2026 designations compound Mr. Wallace's exposure in ways that are not resolved by the pro bono nature of his practice. The Egyptian and Jordanian Muslim Brotherhood chapters' designations as Specially Designated Global Terrorists under E.O. 13224, while not directly triggering § 2339B, further stigmatize the communities Mr.

Wallace serves and create additional investigative and reputational risk for attorneys whose clients are associated with those entities, making his representation of them more legally perilous than at the time this complaint was originally filed;

i. The proclamation's inflammatory rhetoric and subsequent public reprimands[2] suggests a biased[3] and aggressive[4] enforcement posture.[5]

j. Governor Abbott and Attorney General Paxton have made no pretense of their religious and ideological animus, and their public conduct makes the threat of enforcement against Mr. Wallace not merely plausible but immediate. Governor Abbott's tenure has been characterized by documented, deliberate use of anti-Muslim rhetoric as a political instrument: "Throughout Governor Abbott's tenure, Islamophobia has become increasingly normalized and instrumentalized in Texas politics. Muslims have repeatedly been used as convenient targets—not because our community has ever posed a threat, but

---

[2] Press Release, Office of the Texas Governor, Governor Abbott Calls On CFISD To Sever Ties With CAIR-Sponsored Islamic Games (Jan. 21, 2026), https://gov.texas.gov/news/post/governor-abbott-calls-on-cfisd-to-sever-ties-with-cair-sponsored-islamic-games.

[3] Amber Kite, *Texas Gov. Abbott directs state police to open criminal probes into Muslim Brotherhood and CAIR*, FOX 7 AUSTIN (Nov. 20, 2025), https://www.fox7austin.com/news/texas-gov-abbott-directs-state-police-open-criminal-probes-muslim-brotherhood-cair.

[4] Stephanie Gonzalez, *Gov. Abbott urges AG Paxton to strip CAIR Texas of its nonprofit status*, CBS 6 ALBANY (Jan. 28, 2026), https://cbs6albany.com/news/nation-world/gov-abbott-urges-ag-paxton-to-strip-cair-texas-of-its-nonprofit-status.

[5] Eleanor Klibanoff, *Attorney General Ken Paxton asks judge to shut down Muslim advocacy group CAIR*, TEX. TRIB. (Feb. 5, 2026), https://www.texastribune.org/2026/02/05/ken-paxton-cair-lawsuit-muslim-brotherhood/; *see also* Press Release, Office of the Texas Attorney General, Attorney General Ken Paxton Sues the Muslim Brotherhood and CAIR to Stop the Terrorist Groups from Operating in Texas (Feb. 5, 2026), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-sues-muslim-brotherhood-and-cair-stop-terrorist-groups-operating-texas.

because fear of Muslims has proven politically expedient."[6] The *New York Times* has specifically identified the Proclamation as a tactic in a coordinated Republican campaign of anti-Muslim hostility: "Republican officials and candidates in Texas have shifted their rhetorical attack lines from the border fears that dominated recent elections to the state's growing Muslim population, with language that echoes the aftermath of the terror attacks of Sept. 11, 2001. Gov. Greg Abbott has labeled one of the nation's largest Muslim rights groups a terror organization."[7] The *Texas Tribune* confirmed that "Texas GOP candidates [are] making anti-Muslim rhetoric a central piece of their messaging this cycle" and that "opposition to Islam has become a key campaign pillar for some Texas Republicans in statewide races and beyond."[8] Attorney General Paxton brags on his own official website about his investigation "into an Alleged Effort to Impose Sharia Law on Texas"—openly adopting a demonstrably false racist trope as official state policy.[9] The Southern Poverty Law Center, which has monitored extremist rhetoric since 1971, has identified the "sharia law" trope as a "commandeered, framed and deployed . . . foreign

---

[6] Tyler Hicks, *Greg Abbott's CAIR 'terror' label stokes legal fight in Texas's long struggle with Islamophobia*, THE GUARDIAN (Dec. 5, 2025), https://www.theguardian.com/us-news/2025/dec/05/gregg-abbotts-cair-terror-label-stokes-legal-fight-in-texass-long-struggle-with-islamophobia.

[7] J. David Goodman, *Without a Border "Invasion," Texas G.O.P. Turns to an Old Enemy, Islam*, N.Y. TIMES (Feb. 10, 2026), https://www.nytimes.com/2026/02/10/us/politics/texas-muslims-republicans.html.

[8] Gabby Birenbaum, *Anti-Islam rhetoric takes center stage in Texas Republican primary*, TEX. TRIBUNE (Jan. 26, 2026), https://www.texastribune.org/2026/01/26/texas-republicans-sharia-law-anti-muslim-rhetoric/.

[9] Press Release, Office of the Texas Att'y Gen., *Attorney General Ken Paxton Takes Legal Action as Part of a Landmark Investigation into an Alleged Effort to Impose Sharia Law on Texas*, https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-takes-legal-action-part-landmark-investigation-alleged-effort-impose.

threat in the U.S. by some hard-right politicians and their anti-Muslim allies"—not a legitimate legal characterization.[10] This documented pattern of official animus—appearing not merely in off-the-cuff statements but in official press releases, campaign messaging, and formal gubernatorial proclamations—constitutes the kind of government conduct that must be treated as direct evidence of religious hostility, particularly where, as here, it has not been disavowed by Defendants. Against this backdrop, an attorney who actively co-counsels with CAIR in named federal cases,[11] travels to Texas for a month, and publicly challenges the Proclamation cannot plausibly be told that enforcement is implausible.

42.    As a direct result of the Proclamation and Defendants' affirmative enforcement acts, Mr. Wallace has experienced concrete chilling of his speech and professional activities. Specifically: (a) Mr. Wallace has declined to publish planned articles about the Designated Entities on The Ethical Spectacle after consulting with counsel about enforcement risk under Chapter 125; (b) Mr. Wallace is struggling to find Austin office space after landlords expressed concern about Property Code Subchapter H liability; (c) Texas-based clients are reevaluating Mr. Wallace's continued representation, stating concern that his association with the Designated Entities would trigger immigration or criminal investigation; and (d) Texas-based cocounsel are distancing themselves from Mr. Wallace, stating the same concern as Mr. Wallace's clients. These are not self-inflicted injuries based on hypothetical fear. They are

---

[10] Caleb Kiefer, *Anti-Muslim bigotry surges ahead of International Day to Combat Islamophobia*, SPLC HATEWATCH (Mar. 13, 2026), https://www.splcenter.org/resources/hatewatch/anti-muslim-bigotry-international-day-combat-islamophobia/.
[11] Cases involving public expressions of the Muslim faith and protected advocacy against the Zionist occupation, apartheid, and genocide in Palestine.

concrete responses to the Proclamation's operative legal effect and Defendants' demonstrated willingness to enforce it through the February 5, 2026 enforcement lawsuit filed by Attorney General Paxton.

43.     Mr. Wallace's injury is "certainly impending" under *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), and *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). The Proclamation's designations create immediate legal disabilities that attach without further enforcement action: (1) The TCO designation automatically prohibits land acquisition under Tex. Prop. Code § 5.253; (2) The FTO designation automatically exposes "persons promoting or aiding" to Chapter 125 nuisance proceedings; (3) DPS has mandatory duty under Tex. Code Crim. Proc. Art. 67.052 to include associates of Designated Entities in criminal intelligence databases. Mr. Wallace's planned September 2026 activities are "arguably proscribed" by these provisions. *See Driehaus*, 573 U.S. at 162. He need not "expose himself to actual arrest or prosecution" when "there exists a credible threat" that challenged law will be applied to him. *Id.* at 158-59.

44.     Mr. Wallace's injury is direct, not derivative. Mr. Wallace does not assert third-party standing on behalf of clients, venues, or organizations. His injury is direct and personal: (a) The Proclamation's vague terms ('affiliates,' 'persons promoting or aiding') directly regulate Mr. Wallace's own professional conduct as an attorney; (b) His planned September 2026 activities in Texas (writing, speaking, demonstrating, associating) are themselves 'arguably proscribed' by the Proclamation's terms; (c) The threat of enforcement against Mr. Wallace personally—not against third parties—is what chills his conduct. *See Susan B. Anthony List*, 573 U.S. at 158-59 (plaintiff need not 'expose himself to actual arrest or prosecution' when 'there exists a credible threat' that challenged law will be applied to him).

The reactions of third parties (venues, landlords, clients) are evidence of the credibility of the threat against Mr. Wallace, not the source of his standing.

45.     However, Mr. Wallace does not intend to permanently surrender his constitutional rights. He will travel to Austin for an extended period during September 2026, and during that month he will write, demonstrate, agitate, teach, hold conferences, picket the Texas State Capitol, and otherwise publicly challenge this unlawful Proclamation and Texas's official Islamophobia—notwithstanding the threat of prosecution. Community and civic organizations in Texas that would typically host Mr. Wallace, sponsor him, or both have apologized for not doing so because of the Governor's Proclamation and the persecution that awaits them should they organize a seminar, workshop, know your rights (KYR) session or the like.

46.     Mr. Wallace brings this action, in part, to obtain pre-enforcement declaratory and injunctive relief that eliminates the unconstitutional threat hanging over these specific activities before he carries them out. Mr. Wallace's decision to proceed despite the Proclamation is not a concession that no chilling has occurred—the chilling is real, ongoing, and documented. It is evidence that the chilling has not silenced him, but that the continuing and present threat is real and constitutionally intolerable. The First Amendment does not require a plaintiff to permanently yield to an unconstitutional law before seeking relief; it permits him to challenge the law's unconstitutionality before suffering prosecution.

47.     This self-censorship constitutes a concrete, cognizable injury under the First Amendment. The danger of this designation is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution.

48.    Attorney General Paxton's February 5, 2026 enforcement lawsuit targets not only the Designated Entities but also their "affiliates" and "associates"—categories that expressly include attorneys providing legal representation. Texas Civil Practice & Remedies Code § 125.064 authorizes nuisance actions against "persons promoting or aiding" the Designated Entities, which encompasses legal representation under *Holder v. Humanitarian Law Project*, 561 U.S. 1, 8 (2010) (Solicitor General Kagan arguing amicus brief filing could constitute material support). Mr. Wallace's professional conduct is directly regulated, not indirectly affected through third parties.

B.  **DEFENDANTS**

49.    **Defendant Gregory Wayne Abbott** is the Governor of the State of Texas and is sued in his official capacity. Defendant Abbott issued the Proclamation on November 18, 2025, and has neither rescinded nor modified it. He is a proper defendant under *Ex parte Young* because he holds specific statutory duties that constitute compulsion and constraint with respect to the challenged designations and has demonstrated a willingness to exercise those duties.

a.  **Statutory Designation Power with Ongoing Enforcement Consequences.** Texas Property Code § 5.254(a)(2)(A) provides that "the Governor may designate a transnational criminal organization or other entity as subject to the prohibition under § 5.253." This power is assigned exclusively to the Governor by name—not to the Attorney General, not to DPS, not to any other officer. Governor Abbott exercised this specific statutory authority in the Proclamation's operative second paragraph. The property acquisition prohibition (§ 5.253), the criminal penalties (§ 5.258), and the civil penalties (§

5.259) exist with respect to the Designated Entities solely because Abbott exercised § 5.254(a)(2)(A). Only Abbott holds the reciprocal power to rescind that designation. Unlike the executive orders at issue in *Mi Familia Vota v. Abbott*, 977 F.3d 461 (5th Cir. 2020), and *United States v. Abbott*, 85 F.4th 328 (5th Cir. 2023), where enforcement was delegated entirely to other agencies, here the Governor's designation is a continuing legal act that triggers enforcement by other officials. An injunction against Abbott alone would eliminate the designations at their source. *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 45-56 (2021) (officials with authority to stop challenged conduct are proper defendants).

b. **Active Command Over Enforcement Agencies.** Abbott has not merely issued the Proclamation and delegated enforcement. He has actively commanded enforcement through multiple affirmative acts: (1) the Proclamation's recitals state Abbott "consulted with the Director of the Texas Department of Public Safety and the Homeland Security Council as directed by Texas Property Code § 5.254"—an affirmative supervisory act that the Proclamation itself documents; (2) on or about November 18–19, 2025, Abbott directed DPS to open criminal intelligence investigations into organizations identified in the Proclamation pursuant to Texas Code of Criminal Procedure Article 67.051; (3) Abbott has not rescinded the Proclamation despite having exclusive statutory authority to do so; and (4) Attorney General Paxton's February 5, 2026 enforcement lawsuit was filed at Abbott's direction following his designations. These acts constitute the "compulsion or constraint" required

under *Book People*, 91 F.4th at 335, and distinguish this case from cases where the Governor had "no ongoing authority" over enforcement.

c. **Foreign Terrorist Organization Designation as Constitutive Act.** The Foreign Terrorist Organization designation under Texas Penal Code § 71.01(e) is Defendant Abbott's direct constitutive act. Unlike a governor who signs generally applicable legislation that enforcement officials then apply, Abbott issued a proclamation that expressly names specific entities—the Designated Entities—and creates their legal status as Foreign Terrorist Organizations under Texas law by its own operative terms. No intervening act by the Attorney General or DPS Director is required for that legal status to exist. The injuries alleged in this Complaint flow from the designation's existence, not from any filed or threatened enforcement suit. Because Abbott's Proclamation is the offending instrument and the source of the ongoing injury, an injunction directed solely at the Attorney General or DPS Director would provide incomplete relief: it would restrain enforcement proceedings but would leave the designation intact as a valid Texas state instrument. An injunction running to Abbott—requiring him to rescind or refrain from enforcing the Proclamation—is necessary to eliminate the designations at their source.

d. **Distinction from Fifth Circuit Governor Dismissal Cases.** This case is distinguishable from *Morris v. Livingston*, 739 F.3d 740 (5th Cir. 2014), *Mi Familia Vota v. Abbott*, 977 F.3d 461 (5th Cir. 2020), and *United States v. Abbott*, 85 F.4th 328 (5th Cir. 2023), because: (1) Abbott's designation power under § 5.254(a)(2)(A) is a specific statutory charge, not a general executive duty; (2)

Abbott has actively commanded enforcement through DPS investigations and consultation requirements; (3) the designation itself creates ongoing legal disabilities without further legislative action; and (4) only Abbott can rescind the designations that are the source of Plaintiff's injury. *See La Union del Pueblo Entero v. Nelson*, 163 F.4th 239, 259-60 (5th Cir. 2025) (provision-by-provision analysis required; official proper defendant where statute specifically tasked her with implementing and imposing the operative consequences).

e.  **Constitutive Legal Effect.** The Proclamation compels or constrains Plaintiff's conduct through its constitutive legal effect, not merely through the prospect of a future enforcement suit. The FTO designation subjects any "person promoting or aiding" the Designated Entities' "criminal activities" to Chapter 125 injunctive proceedings, civil contempt, and imprisonment. The TCO designation renders affiliates and members prohibited from acquiring real property in Texas under penalty of criminal prosecution (§ 5.258) and civil penalties (§ 5.259). These obligations arise from the Proclamation's existence and bind affected persons without any further act by Paxton or Martin. Mr. Wallace has already curtailed his representation of clients affiliated with the Designated Entities, modified his public speech on topics related to the Designated Entities, declined to open a Texas office for purposes of this representation, and altered planned advocacy activities in Texas—all in direct response to Abbott's Proclamation. These are not self-inflicted injuries based on speculative prosecutorial decisions by officials who have done nothing; they are responses to a legally operative instrument issued by Abbott that has already

produced a downstream enforcement lawsuit and ongoing criminal investigations. Abbott's connection to the challenged designations is direct: he is not merely the head of an agency that enforces the statute—he is the sole officer who created the legal status being challenged."

f. **This Case is Distinguishable from *United States v. Abbott*.** In *Abbott*, 85 F.4th at 336, the Governor was found improper because the executive order vested enforcement discretion entirely in DPS with 'no ongoing authority' reserved to the Governor. *Id.* at 335. Here, by contrast: (a) Texas Property Code § 5.254(a)(2)(A) vests designation power exclusively in the Governor - no other official can designate or rescind; (b) The designation is self-executing - legal disabilities attach automatically without further enforcement act; (c) Governor Abbott has exercised ongoing authority through: (i) consultation with DPS and Homeland Security Council as required by § 5.254; (ii) directing DPS to open criminal intelligence investigations; (iii) declining to rescind despite this litigation; (iv) prompting Attorney General Paxton's February 5, 2026 enforcement lawsuit. *See Book People, Inc.*, 91 F.4th at 335 (official proper where statute specifically tasked her with implementing and imposing the operative consequences). An injunction against the AG or DPS alone would leave the designation intact - only Abbott can rescind it at its source.

50.    **Defendant Ken Paxton** is the Attorney General of the State of Texas, sued in his official capacity. The Attorney General holds exclusive statutory authority under Texas Property Code § 5.255 to investigate and initiate in rem divestiture actions against real property acquired in violation of Subchapter H's land-ownership prohibitions. Under Texas

Civil Practice & Remedies Code § 125.064, the Attorney General shares authority with district, county, and city attorneys to bring nuisance actions under Chapter 125, Subchapter D against entities designated as foreign terrorist organizations. The Attorney General is mandated to develop and manage an electronic gang resource system to assist criminal justice and juvenile agencies in sharing gang-related information. Texas Cooperation with the Texas Department of Criminal Justice is also provided for collecting and maintaining gang intelligence, with statutory governance over access and use of such information. Defendant Paxton is responsible for reviewing and initiating civil enforcement actions against the Designated Entities and persons alleged to be their "affiliates," "members," and "persons promoting or aiding" their activities. The Attorney General has demonstrated willingness to exercise this authority through the February 5, 2026 enforcement lawsuit filed in Collin County District Court. *See Woodlands Pride*, 168 F.4th at 305 (Attorney General proper defendant where statute grants sole authority to recover civil penalties and obtain injunctions). The Attorney General has no independent authority to prosecute criminal offenses under Texas Penal Code Chapter 71; such prosecutions belong exclusively to district and county attorneys under Texas Constitution Article V, § 21.

51. **Defendant Freeman F. Martin** is the Director of the Texas Department of Public Safety, sued in his official capacity. Texas Code of Criminal Procedure Chapter 67 designates DPS as the 'department' for purposes of the entire Chapter 67 framework and mandates that DPS 'shall establish an intelligence database' and maintain all information received from reporting agencies. TX CRIM PRO Art. 67.052. Article 67.051 requires local law enforcement agencies in municipalities of 50,000 or more or counties of 100,000 or more to compile criminal information into intelligence databases and send that information to DPS.

Article 67.054 establishes submission criteria requiring that information be relevant to identifying an organization reasonably suspected of involvement in criminal activity and consist of either a judicial finding of participation, a judicial self-admission of membership, or any two of eight enumerated forms of evidence—including self-admissions (including internet postings), identification by informants, frequenting documented gang areas, use of gang symbols or tattoos, arrest with known gang members, visiting incarcerated gang members (non-family), or using technology to recruit new members. TX CRIM PRO Art. 67.054. Article 67.101 authorizes release of information only to another criminal justice agency, a court, or a defendant entitled to discovery under Chapter 39; unauthorized release is a Class A misdemeanor. Article 67.151 requires removal of adult information after five years if the subject has not been arrested for criminal activity. TX CRIM PRO Art. 67.151.

52.    Additionally, Texas Government Code § 421.003 designates DPS as 'the repository in this state for the collection of multijurisdictional criminal intelligence information that is about terrorist activities or otherwise related to homeland security activities' and 'the state agency that has primary responsibility to analyze and disseminate that information.' Defendant Martin oversees DPS's Bureau of Intelligence, the Criminal Intelligence Service unit, and the Texas Fusion Center's gang section, and has authority to direct the inclusion or removal of individuals and organizations from the statewide criminal intelligence database. These mandatory statutory duties constitute compulsion and constraint sufficient to satisfy *Ex parte Young*. Upon information and belief, DPS has already begun compiling information on individuals and organizations associated with the Designated Entities pursuant to the Proclamation. The Proclamation's recitals state Abbott "consulted with the Director of the Texas Department of Public Safety" as required by § 5.254, and on

or about November 18-19, 2025, Abbott directed DPS to open criminal intelligence investigations. Under Tex. Code Crim. Proc. Art. 67.052, DPS has mandatory duty to maintain this information in the statewide intelligence database. Martin oversees this process and has authority to direct inclusion or removal. Mr. Wallace reasonably fears inclusion in this database based on his professional associations, which would constitute concrete injury under *Driehaus*.

53.    **2025 Legislative Expansion of DPS Intelligence Authority.** The 89th Texas Legislature (2025) enacted significant amendments to the DPS Chapter 411 framework, effective September 1, 2025. A new Subchapter S (§§ 411.551–411.561) formally establishes a Hostile Foreign Adversaries Unit within DPS. TX GOVT § 411.552. This unit is charged with supporting the department's duty to prevent the harassment and coercion of this state's residents from foreign adversary operations, strengthen state agencies against foreign adversary operations, and protect this state's critical infrastructure against threats foreign adversary operations pose. TX GOVT § 411.552. The unit has dedicated authority to collaborate with local governments and federal agencies to operate the Texas Fusion Center and refer cases of foreign adversary operations in Texas for prosecution. TX GOVT § 411.555. The division also has authority to establish research agendas, TX GOVT § 411.560, and run work groups to study border security and critical infrastructure vulnerabilities. TX GOVT § 411.559.

54.    These 2025 amendments demonstrate the Legislature's recent and deliberate expansion of DPS's foreign adversary intelligence functions—confirming that DPS's role in investigating, designating, and tracking entities deemed to pose foreign security threats is not merely historical but actively growing. The Proclamation's designation of the Muslim

Brotherhood and CAIR as "foreign terrorist organizations" falls squarely within the type of foreign adversary intelligence function that the 2025 Legislature empowered DPS to pursue. Defendant Martin, as DPS Director, oversees this newly expanded Unit and its intelligence-gathering operations, further strengthening his enforcement connection to the challenged designations.

55.    *Ex Parte Young* **Standing as to All Defendants.** Each Defendant satisfies the *Ex parte Young* enforcement-connection requirement for at least some of the challenged provisions:

    a. Governor Abbott: Proper defendant for claims challenging the designation itself under Property Code § 5.254(a)(2)(A) and Penal Code § 71.01(e), as only he can rescind the designations at their source.

    b. Attorney General Paxton: Proper defendant for claims challenging civil enforcement under Property Code § 5.255 (divestiture actions), Property Code § 5.259 (civil penalties), and Civil Practice & Remedies Code § 125.064 (nuisance actions), as he holds exclusive or shared authority to initiate these proceedings. *See La Union del Pueblo Entero*, 163 F.4th at 259-60 (officials with authority to impose operative consequences are proper *Young* defendants).

    c. DPS Director Martin: Proper defendant for claims challenging the criminal intelligence database under Code of Criminal Procedure Articles 67.051–67.054 and Government Code § 421.003, as he has mandatory statutory duty to establish and maintain the database, authority to direct inclusion or removal of individuals and organizations, and oversight of the Texas Fusion Center's gang section which must annually report to the governor and legislature on

statewide gang threats. TX GOVT § 421.082. *See Book People, Inc.*, 91 F.4th at 335 (officials who collect, post, review, and enforce compliance satisfy the enforcement-connection requirement).

56.     **DPS Surveillance of Attorney-Client Relationships.** Upon information and belief, DPS's Criminal Intelligence Service maintains records of attorneys who represent individuals or organizations associated with the Designated Entities. Texas Government Code § 421.082 requires the Texas Fusion Center's gang section to collect and analyze information about "criminal street gangs and foreign terrorist organizations"—information that includes attorney-client associations when attorneys are perceived as "promoting or aiding" designated entities. On information and belief, Mr. Wallace's representation of clients and associations affiliated with the Designated Entities has already been flagged in DPS intelligence products. This surveillance constitutes direct injury to Mr. Wallace's attorney-client relationships and professional reputation, independent of any third-party reactions.

## IV.     FACTUAL ALLEGATIONS

### A. THE FEDERAL FOREIGN TERRORIST ORGANIZATION SCHEME

57.     Under 8 U.S.C. § 1189, only the U.S. Secretary of State may designate a Foreign Terrorist Organization ("FTO"), following a detailed administrative process that includes: (a) Specific findings that the organization engages in terrorist activity or terrorism (as defined in federal law); (b) Notice to the designated organization; (c) An opportunity for the organization to present evidence and be heard; and (d) Judicial review in the Court of Appeals for the D.C. Circuit, which may set aside a designation when it is "not supported by substantial evidence."

58.    The federal FTO designation process is designed to provide procedural safeguards, national uniformity, and judicial review—ensuring that designations rest on evidence rather than political whim.

59.    The federal government has acted upon the Muslim Brotherhood only in a chapter-specific, evidence-based manner consistent with the procedural requirements of 8 U.S.C. § 1189. On November 24, 2025—six days after Governor Abbott issued the Proclamation—President Trump signed Executive Order 14362, directing the Secretary of State and Secretary of the Treasury, following consultation with the Attorney General and Director of National Intelligence, to submit a joint report within 30 days and to take all appropriate designation action within 45 days thereafter with respect to specific Muslim Brotherhood chapters in Lebanon, Jordan, and Egypt.

60.    On January 13, 2026, as a result of that process, the following designations were made:

a.    the Department of State designated the *Lebanese* Muslim Brotherhood (also known as al-Jamaa al-Islamiyah) as both a Foreign Terrorist Organization under 8 U.S.C. § 1189 and a Specially Designated Global Terrorist (SDGT) under E.O. 13224;

b.    the Department of the Treasury designated the *Egyptian* Muslim Brotherhood and the *Jordanian* Muslim Brotherhood as SDGTs only—not as FTOs—for allegedly providing material support to Hamas; and

c.    Muhammad Fawzi Taqqosh, the Secretary General of the Lebanese Muslim Brotherhood, was designated as an SDGT.

61.     Critically, the federal government did not designate "the Muslim Brotherhood" as a single, unified global entity. It did not designate CAIR in any capacity. And it designated only three specific foreign chapters based on purported evidentiary findings—not the movement as a whole.

62.     Congress has repeatedly considered legislation[12] directing the Secretary of State to designate the Muslim Brotherhood as a terrorist organization and has consistently declined to pass such legislation.[13] When the executive branch ultimately did act—in accordance with E.O. 14362 and 8 U.S.C. § 1189—it expressly declined to issue a blanket, global designation, instead proceeding chapter-by-chapter with individualized findings. This deliberate, granular approach confirms that the federal designation authority is both exclusive and calibrated: it belongs to federal officials acting through a constitutionally prescribed process, not to state governors acting by unilateral proclamation.

63.     The federal government's chapter-specific action confirms what executive branch officials—over several Republican and Democratic administrations—and nonpartisan experts have long advised Congress: the Muslim Brotherhood does not meet the legal criteria for a single, global designation because it is not a monolithic entity and its various

---

[12] *See, e.g.*, *The Muslim Brotherhood: Hearing Before the Subcomm. on Terrorism, HUMINT, Analysis, and Counterintelligence of the H. Permanent Select Comm. on Intelligence*, 112th Cong. 1 (2011) (testimony of Nathan Brown, Professor, George Washington Univ.) (stating that "the repudiation of securing change through violence is clear, strategic, and sustained" for Brotherhood movements in countries like Egypt and Jordan); ("[T]he Brotherhood has embraced democracy. It never rejected democracy in principle, but for a long time it distrusted party politics . . . But over the last generation, the Brotherhood's dedication to electoral politics . . . has become consistent and deeply engrained in the movement's appeals.").

[13] *See, e.g.*, *Muslim Brotherhood Terrorist Designation Act of 2015*, H.R. 3892, 114th Cong. (2015) (passed by House Judiciary Committee but never brought to floor vote); *Muslim Brotherhood Terrorist Designation Act of 2017*, S. 68, 115th Cong. (2017) (died in committee); *Muslim Brotherhood Terrorist Designation Act*, S. 419, 117th Cong. (2021) (died in committee).

manifestations—many of which are legal political parties in allied nations—do not engage in terrorist activity.[14]

64.    When the federal government acted in January 2026, it did so by making individualized findings as to three distinct foreign chapters based on the specific role each purportedly played in defending against the ongoing occupation of Palestine and Lebanon—exchanging rockets, material support for Hamas, manufacture of weapons. It did not designate the Muslim Brotherhood movement as a whole. It did not designate the Egyptian or Jordanian chapters as FTOs, only as SDGTs. It did not designate any domestic organization. And it did not designate CAIR in any form. The federal action thus reaffirms, rather than undermines, the proposition that a sweeping, undifferentiated designation of "the Muslim Brotherhood and its successor organization CAIR" as a unitary terrorist enterprise—as Texas purports to do—exceeds the bounds of what the evidence, the law, and the Constitution permit.

---

[14] *See, e.g.*, *The Muslim Brotherhood's Global Threat: Hearing Before the Subcomm. on Nat'l Sec. of the H. Comm. on Oversight & Gov't Reform*, 115th Cong. 1 (2018) (statement of Amb. Daniel Benjamin) ("As scholars, intelligence analysts and policymakers in past administrations have come to agree, there is no singular, monolithic Muslim Brotherhood . . . [T]here is no central administration linking these disparate groups."); ("[T]he Muslim Brotherhood does not have the first desideratum of being a 'foreign organization.' While many organizations have links to the original Egyptian Muslim Brotherhood, there is no single foreign organization."); *The Muslim Brotherhood: Hearing Before the Subcomm. on Terrorism, HUMINT, Analysis, and Counterintelligence of the H. Permanent Select Comm. on Intelligence*, 112th Cong. 1 (2011) (testimony of Tarek Masoud, Assistant Professor, Harvard Univ.) ("I have interviewed dozens of members of the Brotherhood, studied the history of the movement, and read widely in the writings of its leaders and thinkers . . . [W]hat we know is that the Muslim Brothers have run in every Egyptian election since 1984 . . . [T]he movement's politicians have been, 'some of the region's most vigorous and outspoken proponents of democratic reform.'"); *see also Ted Cruz's Muslim Brotherhood Terrorist Bill*, Bridge Initiative (Jan. 18, 2017) (article by John L. Esposito, Director, Bridge Initiative) (arguing that designation "would deny American policy makers access to an important resource in the war against ISIL" and noting that "[f]or more than 30 years, Muslim Brotherhood associated movements and parties have been a force for democratization and stability in the Middle East").

65.    The federal scheme is comprehensive and exclusive, occupying the entire field of foreign terrorist organization designations. It reflects Congress's judgment that (a) Uniform national standards are essential to foreign affairs and national security; (b) State-level terrorism designations would create chaos, inconsistent application of law, and interference with federal foreign policy; (c) Due process protections and judicial review are necessary safeguards against arbitrary designations; and (d) International relations require a single national voice on terrorism designations.

66.    The federal government's January 13, 2026 designations pursuant to E.O. 14362 are the most powerful possible confirmation that the federal scheme occupies this field exclusively. The Secretary of State and the Secretary of the Treasury—acting according to the President's explicit direction, following inter-agency consultation with the Attorney General and Director of National Intelligence, and in compliance with the procedural requirements of 8 U.S.C. § 1189—produced a carefully scoped set of designations that: (a) named only specific foreign chapters, not a global Muslim movement; (b) applied different levels of designation (FTO vs. SDGT only) to different chapters based on individualized evidentiary findings; (c) did not designate "the Muslim Brotherhood" as a unitary organization; and (d) did not designate CAIR at all.

67.    Governor Abbott's November 18, 2025 Proclamation, which predated the federal action, purported to accomplish in a single paragraph what the entire federal national security apparatus—proceeding carefully under statutory authority—declined to do even when it had every political incentive and legal authority to do so. This comparison is dispositive on preemption: Texas did not fill a gap left by federal inaction. It usurped a field

that the federal government has now occupied with surgical precision, and it did so more broadly, with less process, and with no evidentiary basis.

## B. THE TEXAS PROCLAMATION AND INVOKED STATUTES

68.    On November 18, 2025, Governor Abbott issued a proclamation ("the Proclamation") designating the Muslim Brotherhood and CAIR as (a) "Foreign Terrorist Organizations" under Texas Penal Code § 71.01(e); and (b) "Transnational Criminal Organizations" under Texas Property Code § 5.254(a)(2)(A).

69.    The Proclamation explicitly invokes enforcement mechanisms that impose serious civil and criminal disabilities:

"(1) 'Designate both the Muslim Brotherhood and its successor organization CAIR as Foreign Terrorist Organizations under Texas Penal Code § 71.01(e), and thereby subject those organizations, and any persons promoting or aiding their criminal activities, to the heightened penalties authorized by Chapter 125 of the Texas Civil Practice and Remedies Code;' and

(2) 'Designate both the Muslim Brotherhood and its successor organization CAIR as Transnational Criminal Organizations and proscribed entities under Texas Property Code § 5.254(a)(2)(A), and thereby subject those organizations, and their affiliates and members, to Chapter 5 of the Texas Property Code, which prohibits them from purchasing or acquiring land in Texas.'"

70.    The Proclamation's rhetoric is explicitly religious and ideological, rather than based on neutral law enforcement criteria. In the official press release announcing the Proclamation, Governor Abbott declared: "The Muslim Brotherhood and CAIR have long made their goals clear: to forcibly impose Sharia law and establish Islam's 'mastership of the

world.'"[15] The Proclamation further asserts that the Muslim Brotherhood and CAIR seek to 'forcibly impose Sharia law,' establish Islam's 'mastership of the world,' and 'subvert our laws through violence, intimidation, and harassment'—conclusory allegations without specific findings of criminal conduct in Texas. This religious framing—invoking 'Sharia law' and Islam's global aspirations—confirms that the Proclamation targets religious belief and practice, not criminal conduct

71.    The Proclamation relies on selectively quoted statements attributed to the Muslim Brotherhood and contested allegations about the movement's history and ideology, rather than specific findings of terrorist conduct in Texas or criminal activity posing a threat to Texas residents, or even anywhere in the United States.

## C.  THE PROCLAMATION'S CONFLATION OF PROTECTED ADVOCACY WITH TERRORISM

72.    The Proclamation's designation of the Muslim Brotherhood and CAIR criminalizes broad categories of pro-Palestinian speech and Muslim religious practice. By labeling CAIR—a prominent civil rights organization that advocates for Palestinian rights—as a "terrorist" entity, the Proclamation effectively stigmatizes and legally jeopardizes *all* advocacy for Palestinian rights by associating it with "material support" for terrorism.

73.    The Proclamation explicitly bases its designation of CAIR as a terrorist organization on protected political speech and advocacy related to Palestinian human rights. Specifically, the Proclamation:

---

[15] Press Release, Office of the Tex. Governor, Governor Abbott Designates Muslim Brotherhood, CAIR As Foreign Terrorist Organizations (Nov. 18, 2025).

a. Cites as a primary justification for the designation that CAIR's Executive Director "publicly praised and supported Hamas's October 7, 2023, attack against Israel, saying he 'was happy to see' the assault" (Proclamation at 2-3);

b. Condemns CAIR for honoring a "supporter of Hamas" at an "anti-Israel rally in Washington, D.C." (Proclamation at 2);

c. Relies on CAIR's alleged connections to Palestinian advocacy groups to justify imposing severe civil and criminal penalties; and

d. Frames advocacy for Palestinian rights as inherently suspect, conflating political criticism of Israeli policy with "promoting or aiding" terrorist activity.

74.    This conflation is not accidental but strategic. By citing these specific instances of political speech—statements about foreign conflicts, attendance at rallies, and expressions of solidarity—as the basis for terrorist designation, the Proclamation demonstrates that its true purpose is to suppress criticism of the Zionist occupation and advocacy for Palestinian rights. It signals that anyone who engages in similar speech or advocacy in Texas may be deemed to be "promoting or aiding" a designated terrorist organization.

75.    This explicit reliance on political speech about the Zionist occupation and Palestine creates a direct link between the designation and the suppression of pro-Palestinian viewpoints. It puts Mr. Wallace and his clients on notice that their advocacy for Palestinian rights—which necessarily involves criticizing Zionist policies and often aligns with viewpoints disfavored by the Governor—may be treated by Texas authorities as evidence of terrorist affiliation or support.

### D. TEXAS PENAL CODE § 71.01(e): DEFINITION OF "FOREIGN TERRORIST ORGANIZATION"

76.    Texas Penal Code § 71.01(e) defines "foreign terrorist organization" as:

"Three or more persons operating as an organization at least partially outside the United States who engage in criminal activity and threaten the security of this state or its residents, including but not limited to a drug cartel."

77.    This statute's language is vague, undefined, and lacking in limiting principles: (a) "Criminal activity" is undefined—it could encompass any activity deemed criminal by any jurisdiction; (b) "Threatens the security" is undefined—it could encompass purely expressive activities, association, or ideological advocacy; (c) "This state or its residents" is defined with no limitation to conduct actually occurring in Texas; (d) No requirement exists that the organization have engaged in any conduct in Texas or that Texas residents face any credible threat.

78.    Under this vague and overbroad definition, the Proclamation designates the Muslim Brotherhood and CAIR without (a) Proving that they engage in "criminal activity" as Texas defines that term; (b) Providing any evidence that they "threaten[] the security" of Texas or its residents; (c) Offering any specific findings of conduct in Texas; or (d) Allowing notice or opportunity to be heard.

79.    This subsection is purely definitional and creates no independent criminal liability.

80.    Criminal liability under Chapter 71 arises from separate operative provisions: § 71.02 (engaging in organized criminal activity); § 71.022 (coercing, inducing, or soliciting membership); and § 71.023 (directing activities of criminal street gangs or foreign terrorist organizations).

81. Criminal prosecutions under Chapter 71 belong exclusively to district and county attorneys under Texas Constitution Article V, § 21. The Attorney General has no independent authority to prosecute Chapter 71 offenses absent consent and deputization by a local prosecutor.

## E. TEXAS PROPERTY CODE § 5.254 AND SUBCHAPTER H: LAND OWNERSHIP PROHIBITIONS

82. Texas Property Code § 5.254(a)(2)(A) authorizes the Governor to designate entities as subject to the land-ownership prohibition under § 5.253. The statute defines a prohibited entity to include an entity the Governor has designated as a foreign terrorist organization or transnational criminal organization by executive order or proclamation.

83. Texas Property Code § 5.255 vests exclusive investigative and enforcement authority in the Attorney General, who "shall establish procedures to examine a purchase or acquisition of an interest in real property and determine whether an investigation of a possible violation of this subchapter is warranted." Upon finding a violation, the Attorney General "may bring an in rem action against real property to enforce this subchapter in a district court in the county where all or part of the real property that is the subject of the violation is located," and "may refer the matter to the appropriate local, state, or federal law enforcement agency" for criminal prosecution under § 5.258.

84. Subchapter H authorizes (i) Investigations into property ownership by the Attorney General; (ii) In rem actions to divest property owned by prohibited entities or their affiliates; (iii) Receiverships; (iv) Civil penalties under § 5.259; and (v) Criminal penalties under § 5.258 for individuals who aid prohibited entities in acquiring land.

85. The term "affiliates" in the Property Code is not defined in the statute cited by the Proclamation. This vagueness allows the state to treat as "affiliates" anyone with any

connection to the Designated Entities, including donors, members, advocates, researchers, or, as particularly relevant here, attorneys.

F. **CHAPTER 125 OF THE TEXAS CIVIL PRACTICE & REMEDIES CODE: CRIMINAL STREET GANG AND TERRORIST ORGANIZATION NUISANCE PROVISIONS**

86.     Chapter 125, Subchapter D authorizes the Attorney General, district attorneys, county attorneys, city attorneys, and private citizens to sue to enjoin a public nuisance constituted by a "foreign terrorist organization" as defined in Texas Penal Code § 71.01(e). Tex. Civ. Prac. & Rem. Code § 125.064. DPS is not assigned any operational role in Chapter 125 actions. TX CIV PRAC & REM § 125.064. However, Section 125.002(f-1) requires hotels and motels subject to nuisance judgments to post signs identifying "the contact information for reporting suspicious activity to the Department of Public Safety." TX CIV PRAC & REM § 125.002(f-1). This is a passive informational reference, not an enforcement role. The primary value of Chapter 125 to DPS operations is indirect: the definition of "gang activity" in § 125.061 is incorporated by reference into the submission criteria of CCP Article 67.054(b)(2)(C)(vi), which permits entry into the gang intelligence database of evidence that an individual was "arrested or taken into custody with known members of a criminal street gang or foreign terrorist organization for an offense or conduct consistent with gang activity as defined by Section 125.061, Civil Practice and Remedies Code." TX CRIM PRO Art. 67.054. This cross-reference links Chapter 125 nuisance law to the evidentiary standards governing DPS database entries

87.     Chapter 125 authorizes courts to issue sweeping injunctions restricting operations of the organization, association among members, use of property for organization-related activities, communications, and meetings.

88.    Violation of a Chapter 125 injunction constitutes criminal contempt and may also constitute a criminal offense under Texas Penal Code § 71.021.

89.    The statute contains no limiting principle on what constitutes an "affiliate" or "person promoting or aiding" the organization, thereby exposing an unlimited class of Texan Muslims and individuals who associate with them to enforcement action.

## G. ABSENCE OF PROCEDURAL PROTECTIONS

90.    No pre-designation notice or opportunity to be heard was afforded to the Designated Entities or any U.S.-based supporters before the Proclamation was issued.

91.    No post-designation mechanism exists under Texas law for the Designated Entities, their alleged "affiliates" or "members," or First Amendment advocates to challenge the designation, present evidence, or clear their names—a stark contrast to the federal FTO process, which includes notice, an opportunity to submit evidence, and judicial review.

92.    No investigation was conducted by the Governor's office to determine whether the Designated Entities engaged in terrorist activity threatening Texas or whether it qualifies as a "foreign terrorist organization" under Texas Penal Code § 71.01(e).

93.    The Proclamation contains no findings regarding (a) What specific "criminal activity" the Designated Entities engaged in; (b) How that activity "threatens the security" of Texas or its residents; (c) Why a Texas state-level designation is necessary given the federal scheme; (d) What evidence supports the designation; or (e) Whether less restrictive alternatives exist.

## H. THE PROCLAMATION IS AN INSTRUMENT OF DOCUMENTED ISLAMOPHOBIA

94.    The Proclamation cannot be understood as a neutral law enforcement measure. It is an instrument of deliberate anti-Muslim hostility, issued in the context of—and as part

of—a documented, publicly acknowledged campaign of Islamophobia by Texas's Republican leadership. Evidence of this animus is found not in isolated off-the-record remarks but in official press releases, published gubernatorial and prosecutorial conduct, contemporaneous journalism, and the Defendants' own official websites.

95.    The *Texas Tribune* reported that "Texas GOP candidates [are] making anti-Muslim rhetoric a central piece of their messaging this cycle. As conservative activists push Republicans to take a harder line against Muslims, and the GOP and its factions debate what constitutes American identity, opposition to Islam has become a key campaign pillar for some Texas Republicans in statewide races and beyond. Muslim civil rights groups say the negative messaging from Republicans around Islam is broader, more extreme and more frequent than in years past, and they worry about the cumulative effect of both heightened rhetoric and anti-Muslim policies."[16]

96.    The *New York Times* reported that this pattern represents a deliberate strategic pivot: "Republican officials and candidates in Texas have shifted their rhetorical attack lines from the border fears that dominated recent elections to the state's growing Muslim population, with language that echoes the aftermath of the terror attacks of Sept. 11, 2001."[17] The *Times* article specifically identified the Proclamation itself as a tactic in this campaign: "Gov. Greg Abbott has labeled one of the nation's largest Muslim rights groups a terror organization." *Id.*

97.    As *The Guardian* documented, Governor Abbott's record is one of systematic Islamophobia: "Throughout Governor Abbott's tenure, Islamophobia has become

---

[16] *Supra* at n.7.
[17] *Supra* at n.6.

increasingly normalized and instrumentalized in Texas politics. Muslims have repeatedly been used as convenient targets—not because our community has ever posed a threat, but because fear of Muslims has proven politically expedient."[18]

98.    Attorney General Paxton has made his animus even more explicit. His own official website publicizes his pursuit of "an Alleged Effort to Impose Sharia Law on Texas," announcing that "Attorney General Ken Paxton demanded documents from the Islamic Tribunal, which is a group that has been accused of making judicial rulings based on sharia law [which has] reportedly sought to replace actual courts of law and evade neutral and generally applicable state and federal laws."[19] This rhetoric—targeting the Islamic practice of private religious arbitration—rests on a demonstrably false premise.

99.    This pattern of official animus extends beyond individual statements to formal party platforms. On July 3, 2025—four months before the Proclamation—the Republican Party of Texas adopted a resolution denouncing CAIR as an "ideological threat" and calling for all elected officials to "immediately suspend all contact and outreach activities with CAIR" and to "publicly denounce CAIR's anti-constitutional agenda." The resolution characterized CAIR's advocacy for religious accommodations (halal meals, Islamic holiday recognition) as "advancing Islamic supremacy in violation of secular governance" and accused CAIR-Texas of "actively promot[ing] Sharia-aligned policies in Texas public institutions." While this resolution was adopted by the Republican Party of Texas rather than the State itself, it reflects the political environment in which Governor Abbott and Attorney General Paxton operate and demonstrates the ideological—not law enforcement—basis for

---

[18] *Supra* at n.5.
[19] *Supra* at n.8.

the Proclamation. The resolution's reliance on decades-old allegations (Holy Land Foundation case from 2008) that the federal government reviewed and rejected when it declined to designate CAIR in January 2026 confirms that the Proclamation is based on political hostility, not current criminal conduct.[20]

100.    The Southern Poverty Law Center, which has analyzed extremist rhetoric since 1971, has explained: "The term 'Shariah law' is a misnomer because Shariah . . . is not actually a law or a universally defined legal code, but a set of guiding principles to living a moral life set out in the Quran. Still, it has been commandeered, framed and deployed as a foreign threat in the U.S. by some hard-right politicians and their anti-Muslim allies."[21]

101.    Texas's own state court complaint[22] confirms the religious animus underlying the Proclamation. The complaint opens by framing the case in religious terms, alleging the Muslim Brotherhood "exists to usurp governmental power and establish dominion through Sharia law" and "does not respect the freedom to practice other religions or sects, including Christianity and Judaism." *See The State of Texas v. Muslim Brotherhood, et al.*, Case No. 471-00734-2026 (Collin Co. Dist. Ct.). The complaint further alleges the Muslim Brotherhood "adheres to a radical interpretation of takfirism that labels Muslims who do not share their ideology as apostates deserving of death" and employs "fighting of the unbelievers." *Id.* ¶¶ 13-15. This religious framing—rather than neutral law enforcement language—confirms that

---

[20] Jordan Leighty, Resolution Denouncing the Council on American-Islamic Relations (CAIR), REPUBLICAN PARTY TEX. (Jul. 3, 2025), https://texasgop.org/resolution-denouncing-the-council-on-american-islamic-relations-cair/.
[21] *Supra* at n.9.
[22] Plaintiff's Original Petition, *State v. Council on American Islamic Relations-Texas*, No. 471-00734-2026 (Collin Co. Dist. Ct., Feb. 5, 2026), https://www.texasattorneygeneral.gov/sites/default/files/images/press/Petition_7.pdf; https://apps2.collincountytx.gov/JudicialOnlineSearch2/case/32332e10-4236-4cd7-bd72-6efbeaba1518.

religious animus, not criminal conduct, drove the designation. The complaint's focus on "Sharia law," "unbelievers," and Islamic theology satisfies the discriminatory purpose prong of an equal protection claim.

102.    Governor Abbott's own words confirm the religious animus underlying the Proclamation. In the official press release announcing the designation, Abbott declared: 'The Muslim Brotherhood and CAIR have long made their goals clear: to forcibly impose Sharia law and establish Islam's "mastership of the world." Press Release, Office of the Tex. Governor, Governor Abbott Designates Muslim Brotherhood, CAIR As Foreign Terrorist Organizations (Nov. 18, 2025). This statement explicitly targets Islamic religious practice ('Sharia law') and Muslim theological beliefs ('Islam's mastership of the world'). The press release further alleges—without evidentiary support—that the Designated Entities seek to "subvert our laws through violence, intimidation, and harassment." These conclusory allegations, framed in religious terms, confirm that the Proclamation is an instrument of anti-Muslim hostility, not neutral law enforcement.

103.    The discriminatory character of Attorney General Paxton's targeting of Islamic private religious arbitration is vividly exposed by comparison to the treatment of Jewish private religious arbitration. In New York State—where Mr. Wallace was born and resides—Orthodox Jewish communities utilize the *Bet Din*, a private religious court that applies Torah law to resolve financial and marital disputes. The Bet Din openly maintains a public website (nybetdin.org) and advertises its services. Torah law applied by the Bet Din includes principles entirely foreign to American civil jurisprudence—including, among others, the rule that a

Jewish woman cannot obtain a divorce without her husband's consent.[23] There is no material distinction between the Bet Din applying Torah law and an Islamic tribunal applying Sharia law as a framework for private religious arbitration among consenting adults. And on information and belief, Orthodox Jewish communities in Texas similarly apply Torah law to adjudicate their legal disputes. Yet Attorney General Paxton is not investigating the Jewish communities of Texas for "an alleged effort to impose Torah law on Texas"—and no such investigation exists anywhere in the United States.

104. This unexplained disparity in the treatment of functionally identical practices is powerful evidence of unconstitutional religious discrimination.

105. The cumulative picture is unmistakable: the Proclamation was not issued as a result of a genuine, neutral law enforcement determination that the Muslim Brotherhood or CAIR poses a credible security threat to Texas. It was issued because Governor Abbott and Attorney General Paxton have systematically weaponized anti-Muslim hostility to advance their political careers, and the Proclamation is the most legally aggressive manifestation of that strategy to date.

## V.    EFFECTS ON MR. WALLACE

106. As a direct result of the Proclamation and the enforcement mechanisms it invokes, Mr. Wallace faces concrete, imminent, and credible threats to his First Amendment and due process rights.

---

[23] *See Jewish Divorce: What Is a 'Get'?*, CHABAD.ORG, https://www.chabad.org/library/article_cdo/aid/557906/jewish/Jewish-Divorce-What-Is-a-Get.htm, ("[T]he husband gives his wife a document of divorce known as a *get* in the presence of witnesses . . . under the careful guidance of a *bet din* (Jewish ecclesiastical court).").

**A.  CHILLING OF LEGAL REPRESENTATION**

107.    Mr. Wallace's civil rights practice since October 2023 has focused almost entirely on representing students, faculty, and professionals targeted for pro-Palestinian speech, anti-Zionist advocacy, or membership in Palestinian, Arab, and Muslim communities. He has represented approximately 1,200 students and 400 faculty members and other professionals, many of whom are members of or affiliated with organizations that advocate for Palestinian rights.

108.    In the ordinary course of this practice, Mr. Wallace regularly engages with individuals and organizations that may be characterized as "affiliates," "members," or persons "promoting or aiding" the Muslim Brotherhood or CAIR under the Proclamation's vague and overbroad definitions. The Proclamation does not define these terms, leaving Mr. Wallace with no clear notice of what conduct or associations are prohibited.

109.    Mr. Wallace is now constrained from continuing this representation because:

   a. Texas law exposes him to prosecution under Tex. Penal Code § 71.01(e) because his legal representation of clients with perceived connections to the Designated Entities is characterized as "promoting or aiding" the organization's "criminal activities;"

   b. In *Holder v. Humanitarian Law Project*, the Supreme Court upheld the federal material-support statute against a First Amendment challenge, and then-Solicitor General Elena Kagan argued that even filing an amicus brief concerning a designated organization's legal rights could constitute "material support"—suggesting that legal representation poses even greater exposure under Texas's parallel scheme;

c. The Proclamation's FTO designation directly threatens Mr. Wallace's existing property since he had taken concrete steps before the Proclamation to establish a Texas professional base for his civil rights practice for clients who are arguably affiliated with the Designated Entities. Those steps have been disrupted and the associated expenditures have been forfeited as a direct consequence of the Proclamation. These are not hypothetical future property interests—they are existing contractual rights and concrete investment-backed professional activities that the Proclamation has already deprived, disrupted, and threatened with further legal jeopardy.

d. The reputational damage from state-level terrorism association, combined with the specter of criminal prosecution, creates a reasonable fear that continuing his current practice will destroy his law practice and professional reputation.

110. This chilling is direct and material. Mr. Wallace has an established practice representing individuals and organizations in communities targeted by the Proclamation. He intends to continue this practice, but reasonably fears that doing so will expose him to enforcement action under Texas law. He is not engaged in hypothetical First Amendment speculation; he is describing the concrete constraints on his ongoing professional work.

B. CHILLING OF SPEECH AND ADVOCACY

111. Mr. Wallace is constrained from engaging in protected speech and advocacy regarding the Designated Entities, Palestinian rights, and the unconstitutionality of the Proclamation because (a) Texas law could characterize such speech as "promoting or aiding" the Designated Entities under the Proclamation's expansive and undefined language; (b) Speaking publicly—via press interviews, blog posts, Substack articles, books, seminars, or

teach-ins—about the Designated Entities or Palestinian advocacy could expose him to enforcement action under Chapter 125 or Property Code Subchapter H; (c) The vague definition of "person promoting or aiding" creates genuine uncertainty about what speech is protected and what crosses into prohibited conduct.

112.    Mr. Wallace wishes to engage in the following protected speech without fear of state prosecution or civil penalty: (a) Speaking to the press and publishing on his blog (*The Ethical Spectacle*, www.spectacle.org) and Substack; (b) Publishing books or articles addressing the Designated Entities, Palestinian rights, or the dangers of state-level terrorism designations; (c) Hosting or organizing seminars, teach-ins, or informational events—in Texas or nationwide—addressing the Designated Entities, federal-state coordination on terrorism designations, or First Amendment implications of the Proclamation; (d) Coordinating with co-counsel and experts in litigation challenging the Proclamation; (e) Advocating for legislative or executive action to rescind the Proclamation or reform Texas law.

113.    As a direct result of the Proclamation, Mr. Wallace has self-censored his speech. He has (a) Declined to publish planned writing about the Designated Entities, and Palestinian advocacy; (b) Refrained from organizing events addressing the Proclamation's unconstitutionality; (c) Limited his public statements about Palestinian rights organizations, and related topics; and (d) Avoided professional activities in Texas that could be characterized as "promoting or aiding" Designated Entities.

114.    This self-censorship constitutes a concrete, cognizable injury under the First Amendment. The danger of this designation is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution.

### C.  CHILLING OF ASSOCIATION AND TRAVEL

115.    Mr. Wallace is constrained from associating with individuals and organizations in Palestinian, Arab, and Muslim communities in Texas, or traveling to Texas for professional purposes related to his civil rights practice for several reasons.

116.    His presence in Texas in connection with individuals or organizations that are arguably "affiliates" or "members" of the Muslim Brotherhood or CAIR are deemed "promoting or aiding" conduct under Tex. Penal Code § 71.01(e).

117.    Mr. Wallace's maintains contractual obligations in Texas.

118.    The uncertainty about what constitutes actionable conduct creates a pervasive chilling effect on all professional association and travel.

119.    Mr. Wallace's connection to Texas is neither incidental nor theoretical—it is a genuine, decades-long relationship that the Proclamation now directly threatens. Although Mr. Wallace is a Jewish attorney originally from Brooklyn who has resided in New York throughout his adult life, Texas has played an outsize role in his legal career, his professional associations, and his personal affections.

    a.  In the 1980s, Mr. Wallace tried and won what was, to his knowledge, the first computer software copyright case ever brought in the federal court in Lubbock, Texas—a landmark matter in the then-nascent field of software intellectual property. He subsequently won a trademark infringement case in the federal district court in Brownsville, Texas.

    b.  During the 1990s, Mr. Wallace served as Vice President of Operations and General Counsel of a New York City-based national technology firm with a major Austin, Texas office. For years on end, he spent as much as one week

every month in Texas for business and personal purposes. He seriously considered relocating to Texas and explored the purchase of a small ranch outside Austin. (He was informed that one way to defray ranch expenses was to permit neighboring ranchers to graze their cattle on his land—an arrangement he found charming, and which led him to envision a future where he would be, as he put it, "all cattle and no hat.")

c.  Today, Mr. Wallace continues to maintain a meaningful Texas connection. He has represented Arab and Muslim faculty, students, and staff at Texas universities who were fired, suspended, sanctioned, investigated, or discriminated against in connection with their protected speech, association, and religious practice. He intends to travel to Texas as needed in connection with those ongoing representations. He works closely with several attorneys who are licensed or based in Texas on matters pending around the country, and he intends to travel to Texas to collaborate with those colleagues in person.

d.  Mr. Wallace also intends to return to Texas for personal as well as professional reasons. He loves the Texas Hill Country and dreams of returning to hike Wild Basin and Enchanted Rock, watch bald eagles on Lake Buchanan, fish for bass on Lake Travis, eat barbecue and authentic Mexican food, catch live music on Sixth Street in Austin, and reconnect with old and new friends and professional contacts—many of them Arab and Muslim—who live and work in Texas.

e.  Critically, Mr. Wallace intends to travel to Austin for an extended period during September 2026, during which he will write, demonstrate, agitate, teach,

hold conferences, picket the Texas State Capitol, and otherwise publicly challenge this unlawful Proclamation and Texas's official Islamophobia.

f.  The Proclamation now renders these activities—professional travel, personal travel, association with Arab and Muslim friends and colleagues in Texas, and public advocacy—legally hazardous. Mr. Wallace cannot travel to Texas, represent clients, collaborate with Texas-based counsel, or socialize with Arab and Muslim community members without the Proclamation creating a credible risk that his conduct will be characterized as "promoting or aiding" a designated terrorist organization. This is not an abstract constitutional harm. It is the concrete suppression of Mr. Wallace's right to travel, to associate, and to practice his profession—by a state government acting out of documented religious animus toward the communities he represents and with whom he associates

## D.  HARM TO VULNERABLE CLIENTS

120.  Mr. Wallace represents visa holders and foreign nationals who are subject to immigration enforcement. Many of these clients are members of Palestinian, Arab, and Muslim communities targeted by the Proclamation.

121.  Mr. Wallace's continued representation of these clients—and his advocacy on issues related to the Designated Entities and Palestinian rights—will arguably trigger immigration investigations and enforcement action against his clients, their family members, and related organizations and individuals in his professional network.

122.  This chilling effect operates with particular force on vulnerable populations. The mere threat of immigration consequences deters visa holders and foreign nationals from

exercising First Amendment rights, seeking legal representation, or associating with attorneys and organizations that advocate for their interests.

123.    Mr. Wallace's ability to effectively represent these vulnerable clients is materially impaired by the Proclamation, which stigmatizes his practice and creates enforcement risks for anyone associated with it.

### E.    CREDIBLE ENFORCEMENT THREAT

124.    Mr. Wallace faces a credible threat of enforcement sufficient to establish standing under *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). The following facts demonstrate enforcement is 'certainly impending' not speculative:

a.    **Active Enforcement Lawsuit.** On February 5, 2026, Attorney General Paxton filed *The State of Texas v. Muslim Brotherhood, et al.*, Case No. 471-00734-2026 (Collin Co. Dist. Ct.), seeking to enforce the Proclamation's designations through Chapter 125 nuisance proceedings. The State's petition expressly acknowledges that "Once issued, the Attorney General has the authority to enforce the Governor's proclamation" and seeks "temporary and permanent injunctive relief prohibiting all Defendants from engaging in any activities within the State of Texas." Tex. Petition ¶¶ 79, 102-103, Prayer ¶ VI(b)-(d). The State further alleges that CAIR "continues to operate in Texas under the same organizational structure established by these convicted terrorists" and seeks to enjoin "any organized criminal activity," "terroristic threats," and "coercing, inducing, or soliciting membership in the Foreign Terrorist Organization." Tex. Petition ¶¶ 88, 128-129, Prayer ¶ VI(c). This is not hypothetical—it is

active, ongoing enforcement against the very organizations Wallace professionally associates with.

b. **DPS Investigation Directives.** The Proclamation's recitals state Abbott 'consulted with the Director of the Texas Department of Public Safety' and directed DPS to open criminal intelligence investigations. Under Tex. Code Crim. Proc. Art. 67.052, DPS has mandatory duty to maintain this information in the statewide database.

c. **Documented Animus.** Governor Abbott and Attorney General Paxton have made public statements demonstrating willingness to enforce against perceived associates of the Designated Entities. *See* ¶¶ 78-91. In the official press release announcing the Proclamation, Governor Abbott declared: "The Muslim Brotherhood and CAIR have long made their goals clear: to forcibly impose Sharia law and establish Islam's "mastership of the world.'" This religious framing confirms that enforcement is driven by ideological and religious hostility, not neutral law enforcement. The Republican Party of Texas July 3, 2025 resolution calling for all elected officials to "publicly denounce CAIR" and "suspend all contact and outreach activities with CAIR" further confirms this pattern.

d. **Third-Party Reactions.** Texas venues, landlords, and clients have already declined to associate with Mr. Wallace due to enforcement concerns. *See* ¶ 43.

e. **No Disavowal.** Defendants have not disavowed enforcement against attorneys, speakers, or advocates who associate with the Designated Entities. Silence in the face of documented chilling effects confirms the threat is credible.

125.    Under *Driehaus*, this evidence establishes standing for pre-enforcement review. Mr. Wallace need not wait for actual prosecution when the threat is "credible" and "imminent."

## VI.    THE PROCLAMATION'S PROCEDURAL POSTURE UNDER TEXAS LAW

126.    The Proclamation was issued without public notice, public comment, a reasoned explanation of the evidentiary basis for the designation, or any administrative record supporting the legal conclusions it announced.

127.    Under the Texas Administrative Procedure Act, Tex. Gov't Code § 2001.003(6)(A), a "rule" is a "state agency statement of general applicability that . . . implements, interprets, or prescribes law or policy."

128.    Whether or not the Proclamation constitutes a "rule" under Texas law is a question reserved for Texas courts and is not asserted as a cause of action in this complaint. What is relevant as a factual matter is that the Proclamation issued none of the procedural protections that Texas law requires of state action of general legal effect: no notice to affected parties, no opportunity to comment, no disclosure of the evidentiary basis for the designation, and no statement of why individuals who engage with Designated Entities—like Mr. Wallace—are subject to the Proclamation's legal consequences.

129.    The Texas Legislature, when it enacted the specific TCO designation authority at Tex. Prop. Code § 5.254, required the Governor to 'consult with the Director of the Texas Department of Public Safety and the Homeland Security Council' before making a designation—a requirement the Proclamation recites as satisfied in its 'WHEREAS' clauses. The Texas Homeland Security Council is an advisory body to the governor, and DPS collaborates with the Council to implement the governor's homeland security strategy. TX

GOVT § 421.024. Section 421.024 requires the HSC to collaborate with DPS in advising the governor on homeland security matters, making the HSC-DPS collaboration mandatory, not discretionary. TX GOVT § 421.024. The governor's homeland security strategy is required by § 421.002(b) to include specific plans for intelligence gathering and analysis, detecting and deterring terrorism, protecting the state's international border, and directing the Texas Fusion Center. TX GOVT § 421.002. This statutory framework demonstrates that the Proclamation was not an isolated executive act but part of a coordinated enforcement scheme involving DPS, the Homeland Security Council, and the Texas Fusion Center. But no provision of Texas law required the Governor to provide notice to the Designated Entities, their affiliates, or counsel representing their members and adjacent communities before creating legal obligations that now chill Mr. Wallace's constitutionally protected professional and expressive conduct.

130.    The procedural circumstances of the Proclamation's issuance are relevant to multiple federal claims in this complaint but do not constitute an independent state law cause of action in this court. First, the complete absence of any pre-deprivation process—despite the Proclamation's immediate legal effect on persons with associational connections to Designated Entities—informs the federal procedural due process analysis under Count II: when a state creates new and immediate legal obligations affecting constitutionally protected liberty interests without any process whatsoever, the constitutional inadequacy of that process is itself a federal due process violation independent of whether Texas law requires rulemaking.

131.    Second, the absence of a reasoned evidentiary record informs the First Amendment retaliation and viewpoint discrimination analysis under Count I: a designation issued without any administrative record that could be tested or contested—unlike a federal

court finding of "ample evidence"—provides no judicially manageable basis for distinguishing a legally grounded designation from a retaliatory or viewpoint-based one.

132. Third, the lack of any adversarial process before the Proclamation issued distinguishes this from the context of the federal FTO designation process under 8 U.S.C. § 1189, which Congress designed with notice requirements, congressional review, and judicial review procedures—a contrast that reinforces the conflict preemption argument in Count V.

## VII. CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 1983
#### FIRST AMENDMENT VIOLATION
**(Free Speech and Association)**

133. Mr. Wallace realleges and incorporates by reference paragraphs 1-130 above.

134. The First Amendment, made enforceable against states through the Fourteenth Amendment, protects:

   a. Freedom of speech: Including speech about political organizations, advocacy, and criticism of government;

   b. Freedom of association: Including professional association with clients and voluntary organizations;

   c. Freedom of petition: Including challenges to governmental action through litigation.

135. The Proclamation, as implemented through § 71.01(e), Chapter 125, and Property Code Subchapter H, imposes content- and viewpoint-based restrictions on speech and association by: (a) Stigmatizing the Muslim Brotherhood (a Muslim-identified theological movement), CAIR (a Muslim-identified organization), and anyone associated with either as "terrorists" and "criminals"; (b) Explicitly emphasizing the movement and

organization's Islamic character and alleged religious goals ("Sharia law," Islam's "mastership of the world"); (c) Targeting speech, association, and representation related to the organization based on its disfavored political and religious viewpoint; and (d) Creating a chilling effect on protected speech through the threat of prosecution and property seizure.

136. These restrictions burden Mr. Wallace's First Amendment rights by:

a. Deterring him from representing clients in Palestinian, Arab, and Muslim communities who may be characterized as "affiliates," "members," or persons "promoting or aiding" the Designated Entities under the Proclamation's vague definitions (core First Amendment activity: litigation and legal advocacy);

b. Deterring him from speaking about the Designated Entities, Palestinian advocacy, or related topics (core First Amendment activity: political speech);

c. Deterring him from associating with individuals and organizations in communities targeted by the Proclamation (core First Amendment activity: voluntary association);

d. Deterring him from traveling to or maintaining a professional presence in Texas for purposes of engaging in protected activity related to his civil rights practice;

e. Rendering it effectively impossible for individuals and organizations in Palestinian, Arab, and Muslim communities—including those affiliated with or characterized as connected to the Designated Entities—to engage in protected advocacy in Texas (including fundraising, meetings, publications, advocacy, and association) without fear of enforcement action against themselves or their attorneys; and

f. Governor Abbott's own announcement of the Proclamation confirms its viewpoint-discriminatory purpose. In the official press release, Abbott declared: "The Muslim Brotherhood and CAIR have long made their goals clear: to forcibly impose Sharia law and establish Islam's 'mastership of the world.'"[24] This statement targets religious ideology ("Sharia law," "Islam's mastership") rather than criminal conduct. The Proclamation similarly condemns the Designated Entities for seeking to "subvert our laws through violence, intimidation, and harassment"—vague, conclusory allegations that could encompass protected advocacy, litigation, and political speech. This confirms the Proclamation's true purpose is suppression of disfavored religious and political viewpoints, not prevention of crime.

137. These restrictions are not narrowly tailored to a compelling government interest and are not the least restrictive means of achieving any legitimate aim because (a) Texas has available all existing federal and state criminal laws to address actual terrorist activity or criminal conduct; (b) The federal FTO designation process already addresses terrorism concerns at the national level; (c) Texas's proclamation is premised on ideological disagreement with the Muslim Brotherhood's goals (Muslims embodying Islam in every facet of their life), not on any specific finding of terrorist conduct in Texas; (d) The designation sweeps in persons engaged purely in protected speech, association, or religious practice; (e) Less restrictive alternatives exist, such as prosecution of actual criminal conduct under existing law; federally coordinated designations; evidence-based findings prior to designation.

---

[24] Press Release, Office of the Tex. Governor (Nov. 18, 2025).

138. The Proclamation is viewpoint discriminatory because:

   a. It targets a Muslim organization specifically because of its Islamic religious character;

   b. Comparable non-Muslim transnational political movements are not subjected to similar state-level designations;

   c. The proclamation's rhetoric explicitly condemns the organization's religious and ideological goals, demonstrating animus based on religion and viewpoint rather than neutral law enforcement criteria;

   d. The Republican Party of Texas July 3, 2025 resolution explicitly condemns CAIR for protected First Amendment activities including criticizing Israeli policy (accused of "comparing Israel to Nazi Germany"), advocating for religious accommodations in public institutions (halal meals, Islamic holiday recognition), and associating with individuals convicted of terrorism-related offenses. The Proclamation similarly targets these protected activities by characterizing them as "promoting or aiding" terrorism. This confirms the Proclamation's true purpose is viewpoint suppression, not crime prevention; and

   e. Texas's state court complaint targets protected First Amendment activity, alleging CAIR provided "organizational, financial, and rhetorical support to campus protests" and established a scholarship program for student activists. Tex. Petition ¶¶ 91-95. These are protected First Amendment activities, not criminal conduct. The Proclamation similarly targets these protected activities

by characterizing them as "promoting or aiding" terrorism. This confirms the Proclamation's true purpose is viewpoint suppression, not crime prevention.

139.    The proclamation violates strict scrutiny and, independently, violates the First Amendment's prohibition on content-based and viewpoint-based discrimination.

140.    Mr. Wallace is injured by the chilling of his First Amendment rights to represent clients of his choice, engage in protected advocacy, and associate with disfavored organizations.

141.    Defendants are responsible for these First Amendment violations in their official capacities as state actors with statutory enforcement authority: Defendant Abbott issued the Proclamation and holds exclusive designation power under Texas Property Code § 5.254(a)(2)(A) with ongoing authority to rescind; Defendant Paxton holds civil enforcement authority under Texas Property Code § 5.255 and Texas Civil Practice & Remedies Code § 125.064 and has demonstrated willingness through the February 5, 2026 enforcement lawsuit; and Defendant Martin oversees DPS's mandatory criminal intelligence database obligations under Texas Code of Criminal Procedure Articles 67.051–67.054. Each Defendant has a particular duty to enforce specific provisions of the challenged scheme and has demonstrated a willingness to exercise that duty. *See Book People, Inc.*, 91 F.4th at 335; *La Union del Pueblo Entero*, 163 F.4th at 259-60.

## COUNT II
### 42 U.S.C. § 1983
#### FOURTEENTH AMENDMENT
### (Procedural Due Process)

142.    Mr. Wallace realleges and incorporates by reference paragraphs 1-130 above.

143.    The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

144. Mr. Wallace has liberty interests protected by the Fourteenth Amendment, including (a) Liberty interest in practicing his profession: The liberty to practice law and represent clients; (b) Liberty interest in avoiding stigmatization: The liberty to avoid government-imposed stigmatizing labels ("terrorist," "criminal") that combine with concrete legal disabilities ("stigma plus"); (c) Liberty interest in free association: The liberty to associate with individuals and organizations of his choice; and (d) Liberty interest in free speech and petition: The liberty to engage in protected speech and litigation.

145. Mr. Wallace has property interests protected by the Fourteenth Amendment, including (a) Existing and prospective property interests in Texas: Any property Mr. Wallace owns or acquires in Texas; (b) Contractual relationships: Existing and prospective business relationships and legal representation relationships; and (c) Professional practice: His law practice and professional reputation.

146. Mr. Wallace's existing attorney-client relationships in Texas constitute protected property interests under the Due Process Clause. Protected property interests are not limited to tangible possessions or formal ownership of real estate; they encompass all legitimate claims of entitlement recognized by statute, regulation, or contract. The Proclamation threatens these existing property interests in a direct and present way: by characterizing Plaintiff's clients—or the organizations with which they are affiliated—as "members" or "affiliates" of the Designated Entities subject to the Proclamation's legal consequences, it creates an active legal risk that Plaintiff's continued performance of these contracts constitutes "promoting or aiding" the Designated Entities' "criminal activities" under the FTO designation's enforcement mechanism.

147.    Mr. Wallace's right to continue his existing consultations in Texas on federal civil rights and constitutional matters is a specific exercise of a professional right that has ripened into an existing property interest. The Proclamation's legal jeopardy for Mr. Wallace's Texas professional activity deprives him of these specific, vested, and economically valuable property interests without adequate process.

148.    Mr. Wallace's property interests are (1) existing contractual attorney-client relationships and consultations on pending and developing federal civil rights and constitutional litigation—property that Mr. Wallace currently holds, not property he might someday acquire; and (2) the concrete, partly-consummated preparatory steps toward a Texas professional presence described in this Complaint, which have already been disrupted and have already caused concrete economic loss. These are present deprivations of existing property interests, which are recognized as concrete harm as rights that extend well beyond ownership of real estate into existing rules or understandings that stem from state law.

149.    Mr. Wallace holds existing contractual property interests in Texas, including Texas-based clients and round-trip airfare for travel to Austin, Texas for September 2026. The Proclamation threatens these existing property interests by making performance of these contracts legally risky. Protected property interests extend beyond real estate ownership to contractual rights recognized by state law. *See Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). Mr. Wallace's non-refundable travel arrangements constitute a concrete economic investment that has already been made and will be forfeited if the Proclamation prevents his intended protected activities in Texas.

150.    The Proclamation and invoked statutes impose severe consequences without pre-deprivation process: (a) Land-ownership ban affecting Mr. Wallace's property interests;

(b) Enhanced penalties and enforcement authority affecting his liberty interest in practicing law; (c) Stigmatizing "terrorist" and "criminal" labels affecting his reputation and professional standing; and (d) Chilling of representation relationships affecting his contractual and professional interests.

151.    The Proclamation provides no pre-designation notice or opportunity to be heard to the Designated Entities, Mr. Wallace, or any other affected party. Unlike the federal FTO designation process under 8 U.S.C. § 1189—which requires notice to Congress, Federal Register publication, administrative record development, and judicial review in the D.C. Circuit—Texas's scheme provides no process whatsoever before or after the Governor's unilateral designation.

152.    No post-designation mechanism exists for any affected person to challenge the designation, present evidence, or request reconsideration, which constitutes a fundamental failure to provide meaningful due process.

153.    The Proclamation contains no neutral decision-maker requirement: It is issued unilaterally by the Governor, reviewed by no judicial or administrative body, and subject to no appellate review.

154.    More fundamentally, the Proclamation's standards are vague and undefined: "Criminal activity," "threatens the security," "persons promoting or aiding," and "affiliates" are all undefined, leaving Mr. Wallace with no clear notice of what conduct is prohibited.

155.    The availability of less burdensome alternatives demonstrates that the Proclamation's procedures are not minimally necessary: (a) Pre-designation notice and an opportunity to respond; (b) Evidentiary hearing before a neutral decision-maker; and (c)

Specific findings of fact regarding terrorist conduct or threat to Texas security; (d) Judicial review; and (e) An opportunity to petition for reconsideration or removal.

156.    Even under a rational-basis standard, the Proclamation fails because (a) It is not rationally related to protecting Texas security (Texas faces no specific threat from the Designated Entities); (b) It violates the "rational basis with teeth" standard applicable to cases involving significant First Amendment or liberty interests; and (c) It sweeps in protected activity that has no conceivable connection to any legitimate state interest.

157.    The procedural circumstances of the Proclamation's issuance, as described above, independently violate the Due Process Clause as applied to Mr. Wallace. The Proclamation was issued as an immediate, binding executive act that created new legal obligations affecting persons who associate professionally and expressly with the Designated Entities, and their adjacent organizations.

158.    Mr. Wallace holds a constitutionally protected liberty interest in his professional relationships as an attorney, in his expressive and associational activities, and in his ability to engage in lawful advocacy—all of which the Proclamation has chilled, as alleged above. The government may not deprive a person of such liberty interests without adequate process. The private interest here is substantial (Mr. Wallace's First Amendment-adjacent professional practice and expressive liberty); the risk of erroneous deprivation through the absence of any pre-issuance process is high (the Proclamation was issued based solely on Defendant Abbott's anti-Muslim bias, without any neutral adjudicative finding); and the government's interest in avoiding pre-issuance process is minimal (the federal terrorism designation scheme under 8 U.S.C. § 1189 shows that meaningful process and national-security designations are fully compatible).

159.    The Proclamation's lack of evidentiary basis is confirmed by Texas's own state court complaint, which relies on vague allegations of "secretive, localized, and cell-like structure" and "underground" organization without specific evidence of current Texas criminal conduct. Tex. Petition ¶¶ 31, 104. The complaint alleges the Muslim Brotherhood "continues to operate as a clandestine paramilitary organization, having returned to its historical roots by reorganizing into a secretive cell-based structure" and that its "systemic and unlawful activities cannot be reduced to certain specific places within the State." *Id.* These are conclusory allegations, not evidence of specific criminal conduct in Texas. No pre-designation notice or opportunity to be heard was afforded to the Designated Entities, Mr. Wallace, or any other affected party. Unlike the federal FTO designation process under 8 U.S.C. § 1189—which requires notice to Congress, Federal Register publication, administrative record development, and judicial review in the D.C. Circuit—Texas's scheme provides no process whatsoever before or after the Governor's unilateral designation. This renders the Proclamation constitutionally arbitrary as applied to individuals whose constitutionally protected liberty interests are chilled by its terms.

160.    The proclamation thus violates Mr. Wallace's right to procedural due process under the Fourteenth Amendment.

### COUNT III
### 42 U.S.C. § 1983
#### FOURTEENTH AMENDMENT
#### (Equal Protection – Discriminatory Prupose)

161.    Mr. Wallace realleges and incorporates by reference paragraphs 1-130 above.

162.    The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

163.    The Proclamation discriminates on the basis of religion by (a) Targeting the Muslim Brotherhood (a Muslim-identified theological movement), CAIR (a Muslim-identified organization), and anyone associated with either for a designation that comparable non-Muslim organizations do not receive; (b) Explicitly emphasizing the movement and organization's Islamic character ("Sharia law," Islam's "mastership of the world"); (c) Applying a designation and enforcement regime disproportionately to Muslim advocacy and Muslim organizations; and (d) Singling out religious and ideological viewpoints disfavored by state officials.

164.    The Proclamation discriminates on the basis of viewpoint by (a) Targeting a theological movement and civil rights organization specifically because of their ideological goals (Muslims embodying Islam in every facet of their life); (b) Applying enforcement mechanisms to suppress criticism of the Zionist occupation and advocacy for Palestinian rights (which the Proclamation correlates with support for or advocacy related to the Muslim Brotherhood and CAIR); and (c) Engaging in disparate treatment and creating a disparate impact on advocates for Palestinian rights and Muslim communities while allowing comparable speech by pro-Zionist advocates.

165.    The discriminatory character of the Proclamation is most vividly illustrated by comparing the treatment of Islamic private religious arbitration with that of Jewish private religious arbitration. Orthodox Jewish communities openly utilize the *Bet Din*, a private religious court applying Torah law—including Torah law containing provisions entirely foreign to American civil jurisprudence, such as the rule that a Jewish woman cannot obtain a divorce without her husband's consent—to resolve financial and marital disputes among

consenting parties.[25] The Bet Din openly advertises its services and maintains a public website.[26] Yet Attorney General Paxton specifically and officially targets Islamic private religious arbitration as constituting an unlawful "effort to impose Sharia law on Texas," while making no analogous investigation of Torah law arbitration.[27] There is no material legal distinction between private consensual arbitration conducted under Islamic religious principles and private consensual arbitration conducted under Jewish religious principles. The Government's selective pursuit of Islamic private arbitration while ignoring functionally identical Jewish private arbitration is itself powerful direct evidence of the unconstitutional religious discrimination that inspires, animates, and drives the Proclamation.

166.    Similarly, Texas has subjected the Designated Entities—a Muslim-identified movement and a Muslim-identified organization—to state-level terrorist designation, while making no comparable designation of non-Muslim transnational organizations with documented links to extremist ideologies, foreign governments, or anti-democratic movements. This selective application of the state's designation authority—targeting Muslim organizations while leaving comparable non-Muslim organizations untouched—satisfies the discriminatory purpose prong of an equal protection claim.

167.    Defendants' own public statements and documented pattern of official conduct provide direct evidence of discriminatory purpose. *See* ¶¶ 74–82. Under *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) "official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." And under *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 584

---

[25] Yerachmiel D. Fried, *Beis Din Is Necessary to Deal with Disputes*, TEX. JEWISH POST (Aug. 22, 2019), https://tjpnews.com/beis-din-is-necessary-to-deal-with-disputes/.
[26] *See* Dallas Beis Din, https://dallasbeisdin.org; Beth Din of America, https://bethdin.org/.
[27] An investigation into Torah law arbitration would also be unlawful.

U.S. 617 (2018), official statements of religious hostility that go unretracted and unrepudiated by the governmental actors responsible for a challenged action are direct evidence that the government failed to consider religious objections with the required neutrality. Defendants' statements here appear not in hearing transcripts but in formal gubernatorial proclamations, official press releases, and Defendant Paxton's own website—the highest available level of official endorsement.

168.    The Republican Party of Texas July 3, 2025 resolution—adopted four months before the Proclamation—further demonstrates this discriminatory purpose. The resolution called for all elected officials to 'publicly denounce CAIR' and characterized CAIR's advocacy for religious accommodations as "Islamic supremacy." This resolution reflects the political ecosystem from which the Proclamation emerged and confirms that religious animus, not neutral law enforcement, drove the designation. The resolution's explicit focus on Islamic religious practices (halal meals, Sharia law, Islamic holidays) rather than criminal conduct confirms that the Proclamation targets religion, not crime.

169.    Texas's state court complaint similarly opens by framing the case in religious terms, alleging the Muslim Brotherhood "exists to usurp governmental power and establish dominion through Sharia law" and "does not respect the freedom to practice other religions or sects, including Christianity and Judaism." Original Petition, *The State of Texas v. Muslim Brotherhood, et al.*, Case No. 471-00734-2026 (Collin Co. Dist. Ct. Feb. 5, 2026) ¶ 1. The complaint further alleges the Muslim Brotherhood "adheres to a radical interpretation of takfirism that labels Muslims who do not share their ideology as apostates deserving of death" and employs "fighting of the unbelievers." *Id.* ¶¶ 13-15. This religious framing—rather than neutral law enforcement language—confirms that religious animus, not criminal conduct,

drove the designation. The complaint's focus on "Sharia law," "unbelievers," and Muslim theology satisfies the discriminatory purpose prong of an equal protection claim.

170. Governor Abbott's official announcement of the Proclamation provides the most direct evidence of religious animus. In the press release issued by his own office, Abbott declared: 'The Muslim Brotherhood and CAIR have long made their goals clear: to forcibly impose Sharia law and establish Islam's "mastership of the world." Press Release, Office of the Tex. Governor (Nov. 18, 2025). This statement explicitly targets Islamic religious practice ("Sharia law") and Muslim theological aspirations ("Islam's mastership of the world"). No comparable designation has been issued against non-Muslim organizations with analogous religious or ideological goals. The Governor's own words confirm that religious hostility, not neutral law enforcement, drove the Proclamation. *See Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 534 ("Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality.").

171. These classifications trigger strict scrutiny because they implicate religion (designating a Muslim movement and a Muslim organization for ideological rather than criminal reasons), implicate viewpoint (targeting protected political speech and advocacy), and implicate fundamental rights (chilling First Amendment freedoms of speech, association, and petition).

172. The Proclamation cannot survive strict scrutiny because:

    a. Compelling interest: The state's interest in preventing terrorism is legitimate, but this interest is already addressed by the federal FTO designation process— the state has not articulated a compelling state interest served by a parallel state-level designation;

b. Narrow tailoring: The Proclamation is not narrowly tailored because it sweeps in protected speech, association, and advocacy; it targets ideological viewpoints rather than criminal conduct; it provides no procedural safeguards; and it conflicts with the federal scheme;

c. Least restrictive means: Less restrictive alternatives exist, including prosecution of actual criminal conduct under existing law.

173. In consequence, the Proclamation's classifications are not facially neutral and independently reflect governmental animus toward the Muslim faith and Muslim-affiliated organizations. They thus trigger strict scrutiny on both Equal Protection and Free Exercise grounds, and cannot survive it.

174. Even under rational-basis review, the Proclamation fails because (a) The state's articulated rationale (prevention of terrorism) is pretextual—the real motivation is suppression of advocacy for Palestinian rights, Muslim activism, and Muslim practice of Islam; (b) The Proclamation is arbitrary and irrational: it sweeps in an entire global movement and perceived supporters with no individualized findings; it is premised on ideological disagreement rather than criminal conduct; and it contradicts federal policy (Congress has considered and rejected blanket designation of the Muslim Brotherhood as a global entity; the federal government, when it did act in accordance with E.O. 14362, confirmed the non-monolithic nature of the Muslim Brotherhood by designating only three specific foreign chapters—and did not designate CAIR in any capacity, confirming that CAIR's inclusion in the Texas Proclamation is unsupported by any federal determination and thus arbitrary on its face); and (c) No rational relationship exists between the stated justification (terrorism prevention) and the blanket designation applied without investigation or evidence.

175. The Proclamation thus violates Mr. Wallace's right to equal protection under the Fourteenth Amendment.

## COUNT IV
## U.S. Const. art. I, § 10
### BILL OF ATTAINDER

176. Mr. Wallace realleges and incorporates by reference paragraphs 1-130 above.

177. The Constitution provides that "no State shall . . . pass any Bill of Attainder" U.S. Const. art. I, § 10, cl. 1.

178. This prohibition applies to any state actor exercising sovereign power to condemn named entities and impose punishment without judicial process. While the Clause text references "State" action generally, the Supreme Court has applied it to executive actions that function as legislative punishment. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 471-72 (1977) (analyzing whether statute was bill of attainder); *United States v. Lovett*, 328 U.S. 303, 315-18 (1946) (congressional appropriations rider held bill of attainder). Texas Government Code § 418.012 provides that gubernatorial proclamations "have the force and effect of law"—they are not mere executive recommendations but legally binding instruments that operate prospectively and generally. When a Governor issues a proclamation that names specific entities, imposes punishment, and provides no judicial process, it functions as a bill of attainder regardless of the label attached. *See* Tex. Gov't Code § 418.012.

179. A gubernatorial proclamation that (a) names specific organizations; (b) imposes civil and criminal disabilities upon them and upon any persons "promoting or aiding" them; and (c) directs the entire enforcement apparatus of the state against them— without notice, without a hearing, and without judicial review—is a bill of attainder within the meaning of Article I, Section 10, regardless of whether it issues from a legislature or a

governor. *See* Tex. Gov't Code § 418.012 (Texas gubernatorial proclamations "have the force and effect of law").

180.    The constitutional prohibition reaches all state acts that function as punishment of specifically named parties without judicial process. The Clause was intended to prohibit legislative punishment, of any form or severity, of specifically designated persons or groups. The Clause implements the separation of powers and constitutes a general safeguard against legislative exercise of the judicial function, or more simply, trial by legislature.

181.    The Fifth Circuit applies a two-pronged test to Bill of Attainder claims: (1) whether the challenged act specifies the affected parties by name or by reference to a readily identifiable class; and (2) whether it imposes "punishment" upon them. Punishment is assessed under a three-part inquiry drawn from *Nixon*: (a) whether the act falls within the historical meaning of legislative punishment (e.g., imprisonment, banishment, punitive confiscation of property, or bar from a vocation or profession); (b) whether the act can reasonably be said to further any nonpunitive legislative purpose; and (c) whether the legislative record evinces intent to punish. The Proclamation fails on both the specificity question (establishing liability) and all three punishment prongs (establishing punishment).

182.    *Specificity.* The Proclamation identifies the Muslim Brotherhood and CAIR by name in a unilateral executive act, subjecting them and all "affiliates," "members," and "persons promoting or aiding" them to specific legal disabilities. This is not a general regulatory classification applicable to any entity meeting neutral statutory criteria. The Proclamation names these two organizations and no others. There is no neutral administrative proceeding through which any other organization could have been designated, and no mechanism through which the Muslim Brotherhood or CAIR can petition for

removal. The name-specific, non-reviewable character of the Proclamation satisfies the specificity prong.

183.    *Historical Punishment.* The Proclamation imposes multiple categories of sanction squarely within the historical understanding of legislative punishment. First, it bars designated parties and their affiliates from owning land in Texas under Property Code Subchapter H—a form of punitive property deprivation analogous to the historically prohibited punitive confiscation of property. Second, it subjects designated parties and their associates to inclusion in criminal intelligence databases—a partial form of civic banishment. Third, it subjects "persons promoting or aiding" Designated Entities to heightened civil penalties and Chapter 125 prosecution—a direct employment bar that threatens to destroy the professional practice of any attorney, like Mr. Wallace, who continues to represent persons associated with the Designated Entities. Courts have consistently recognized these categories as historically punitive. The destruction of a person's ability to earn a living in his chosen profession is precisely the kind of harm the Clause was designed to prohibit. The Proclamation's effect on Mr. Wallace—designating as a terrorist organization the co-counsel with whom he currently partners in several active federal cases—is precisely this.

184.    *Nonpunitive Purpose.* Here, the Proclamation serves no legitimate nonpunitive regulatory purpose that existing law does not already address. The federal government already exercises exclusive authority over foreign terrorist designations under 8 U.S.C. § 1189. Texas already has criminal statutes to prosecute actual terrorist conduct. The federal government itself—having completed the process mandated by E.O. 14362—declined to designate the Muslim Brotherhood globally and declined to designate CAIR at all. There is no regulatory gap that the Proclamation fills. Its only discernible purpose—as established by the explicit

religious-ideological rhetoric in its recitals ("Sharia law," Islam's "mastership of the world") and the documented context of hatemongering and anti-Muslim political campaigns in which it was issued—is to punish and suppress Muslims, public expressions of Islam, and a prominent organization and religious movement, and their perceived associates for their viewpoints. The Proclamation imposes a permanent, non-reviewable disability with no benefit to the designated parties, no reciprocal obligation on the state, and no administrative mechanism for challenge. It is pure punishment, rooted in hate.

185. *Punitive Intent.* The legislative record—here, the Proclamation itself and the documented public statements of its authors—reveals overwhelming evidence of punitive intent. Governor Abbott and Attorney General Paxton have made no secret of their hostility toward the Designated Entities and American Muslim communities generally. The Proclamation explicitly condemns the Designated Entities for their Muslim religious character and goals. Defendant Paxton has filed suit to shut down CAIR Texas entirely and has publicized his campaign against Islamic arbitration as an "effort to impose Sharia law on Texas." The *New York Times* and the *Texas Tribune* have both reported that the Proclamation was issued as part of a deliberate campaign of anti-Muslim political hostility and animus. This is not a smattering of legislators' personal opinions, it is the explicit, documented, official policy of the Defendants themselves, expressed in their capacity as the decision-making and enforcement body.

186. Here, Defendants are exacting self-executing punishment; not seeking to apply a pre-existing neutral scheme. Defendant Abbott has issued a proclamation that *names* specific Muslim entities—the Muslim Brotherhood and CAIR—and *creates* disabilities that do not flow from any pre-existing neutral criteria but instead are triggered solely by the anti-Muslim

targeted naming. There was no prior Texas statute designating the Muslim Brotherhood or CAIR as terrorist organizations. There was no Texas administrative proceeding applying neutral criteria. The Governor named them; the disabilities followed. That is not regulatory classification. It is gubernatorial condemnation—and it is squarely within the conduct the Bill of Attainder Clause exists to prohibit.[28]

187.    Governor Abbott's official press release announcing the Proclamation declared: "The Muslim Brotherhood and CAIR have long made their goals clear: to forcibly impose Sharia law and establish Islam's 'mastership of the world.'" This statement reveals punitive intent rooted in religious animus, not regulatory purpose. The Proclamation imposes permanent, non-reviewable disabilities based solely on the Governor's condemnation of Islamic religious goals—precisely the type of legislative punishment the Bill of Attainder Clause prohibits.

188.    **Functional Analysis Controls.** The Bill of Attainder Clause is concerned with substance, not form. Here, the Proclamation functions identically to a legislative bill of attainder: (a) It names specific entities (Muslim Brotherhood, CAIR); (b) It imposes punishment (land-ownership ban, criminal exposure, intelligence database inclusion, professional destruction); (c) It provides no judicial process; (d) It is self-executing and binding under Texas law. The fact that this punishment was issued by executive proclamation rather than legislative statute is a distinction without a difference for Bill of Attainder purposes.

---

[28] Relatedly, in *CAIR-Foundation, Inc. v. DeSantis*, 2026 WL 613468 (N.D. Fla. Mar. 4, 2026), the court preliminarily enjoined Florida's analogous executive designation, finding that the governor had provided "no substantive explanation of his authority" and "no mechanism for judicial review"—factors that reinforce the bill-of-attainder analysis by confirming the absence of any procedural framework that would take the designation out of the classic attainder paradigm.

Texas Government Code § 418.012 treats proclamations as having "force and effect of law"—the functional equivalent of legislation for purposes of imposing legal disabilities.

189. The Proclamation thus violates the Bill of Attainder Clause of Article I, Section 10, Clause 1 of the United States Constitution, and must be declared void and enjoined.

190. **Alternative: Procedural Due Process Violation.** Even if this Court finds the Bill of Attainder Clause inapplicable to executive proclamations, the Proclamation violates procedural due process for identical reasons. The government may not impose punitive disabilities on named entities without notice, hearing, and neutral adjudication. *See Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 184-87 (1951) (Jackson, J., concurring) (executive designation of organizations as 'communist' without process violates due process). The Proclamation's lack of pre-deprivation process, post-deprivation review mechanism, or neutral decision-maker renders it constitutionally arbitrary regardless of whether it is labeled a bill of attainder or a due process violation.

## COUNT V
### U.S. Const. art. VI, cl. 2
#### FEDERAL PREEMPTION
#### (Supremacy Clause)

191. Mr. Wallace realleges and incorporates by reference paragraphs 1-130 above.

192. This Count is brought directly under the Supremacy Clause of the United States Constitution, Article VI, clause 2, per this Court's inherent equitable power to enjoin state officials from enforcing state law that is preempted by federal law. The Proclamation is preempted under both conflict preemption and field preemption theories, with conflict preemption providing the strongest basis for relief.

193.   This Count is not brought under 42 U.S.C. § 1983. Preemption claims proceed under federal courts' equitable jurisdiction, not § 1983. Mr. Wallace invokes this Court's equitable jurisdiction to enjoin Defendants from enforcing preempted state law.

194.   The Supremacy Clause provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. A state law is preempted when it: (a) conflicts with federal law such that compliance with both is impossible; (b) stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress; or (c) operates in a field that Congress has occupied so pervasively that no room remains for supplementary state regulation.

195.   Federal law, through 8 U.S.C. § 1189, occupies the entire field of foreign terrorist organization designations, assigning that authority exclusively to the U.S. Secretary of State pursuant to a multi-step framework that includes: (a) designation criteria requiring that the organization be foreign, engage in terrorist activity as defined in federal law, and threaten the security of U.S. nationals or U.S. national security; (b) a two-tier notice system including advance classified notification to Congress and subsequent Federal Register publication; (c) an administrative record requirement; (d) provisions for classified evidence to be submitted to a reviewing court *ex parte* and *in camera*; and (e) mandatory judicial review before the U.S. Court of Appeals for the D.C. Circuit, which may set aside a designation not supported by substantial evidence. 8 U.S.C. §§ 1189(a)(1)–(4). This framework reflects Congress's judgment that uniform national standards, federal expertise in foreign affairs and national security, procedural safeguards, and judicial review are indispensable to any

legitimate terrorism designation process—and that no room remains for states to operate a parallel designation regime.

196.    The occupied field extends not only to what Congress enacted but to what Congress deliberated and declined to expand. As alleged above, Congress has repeatedly considered and declined to pass blanket Muslim Brotherhood or CAIR designation legislation. When the executive branch finally acted per E.O. 14362 and § 1189 on January 13, 2026, it designated only three specific foreign chapters, declined to issue a global designation, and declined to designate CAIR in any capacity. These deliberate choices—to act narrowly, with precision, under procedural constraints—occupy the field not only by what the federal government did but by what it consciously chose not to do. A state governor issuing a broader, faster, evidence-free designation six weeks before the federal government started a substantive inquiry is not filling a gap Congress left open. No, Defendant Abbott is preempting federal deliberation in a field the Constitution and federal statute assign exclusively to the federal executive.

197.    The Proclamation directly conflicts with federal law in at least four specific and demonstrable respects. First, *Direct Contradiction of Federal Designation Scope*. The federal government, after completing the process mandated by E.O. 14362 and § 1189, designated the Egyptian and Jordanian Muslim Brotherhood chapters as SDGTs—not as FTOs. Texas purported to designate the same organizations (as part of a global Muslim Brotherhood designation) as both Foreign Terrorist Organizations and Transnational Criminal Organizations. A person in Texas is simultaneously subject to Texas's FTO designation of these entities and the federal government's determination that they do not meet the criteria

for FTO designation under § 1189. Compliance with both is impossible and the conflict is irreconcilable.

198.    Second, *Direct Contradiction of the Federal Non-Designation of CAIR*. The federal government did not designate CAIR in any capacity. Texas designated CAIR as both a Foreign Terrorist Organization and a Transnational Criminal Organization. Even Texas's own state court complaint acknowledges the January 13, 2026 federal designations included only "the Egyptian Muslim Brotherhood, the Jordanian Muslim Brotherhood, and the Lebanese Muslim Brotherhood"—CAIR is conspicuously absent. Tex. Petition ¶ 85. This is not a case where state law supplements federal law; it is a case where state law directly overrides a deliberate federal decision not to act.

199.    Third, *Reliance on Unfounded anti-Muslim Conspiracy Theories, Not Current Conduct*. Texas's complaint relies extensively on unproven allegations from the 2008 Holy Land Foundation trial—including the personal aspirations of a single individual, Mohamed Akram, expressed in his 1991 "Explanatory Memorandum," uncorroborated assertions made at a 1993 Philadelphia gathering of American Muslim leaders, and the politically motivated 2009 FBI severance of formal outreach ties—but alleges no specific criminal conduct by CAIR in Texas (or anywhere). Tex. Petition ¶¶ 40-68. The federal government reviewed this same historical evidence in January 2026 and declined to designate CAIR in any capacity. Texas's designation overrides the federal government's considered determination that this historical evidence does not warrant designation.

200.    Fourth, *Obstacle to Federal Foreign Affairs Authority*. Defendant Abbott's designation directly obstructs the federal government's calibrated, diplomatically sensitive, and ongoing approach to Muslim Brotherhood designations. The federal government

expressly characterized its January 2026 designations as the beginning of a "sustained effort" to be conducted through the federal process. Texas has locked in a sweeping, undifferentiated state-level designation that substitutes the Governor's individual judgment for the collective judgment of the Secretary of State, Secretary of the Treasury, the Attorney General, and the Director of National Intelligence acting under presidential direction—thereby interfering with a live, evolving federal foreign policy process.

201. Fifth, *Intrusion on Federal Executive Foreign Affairs Power*. State laws that interfere with the executive branch's exclusive domain over foreign affairs and terrorism designations are preempted even absent express preemption by statute. CAIR is an exclusively American Muslim civil rights nonprofit. Designating a domestic civil rights organization as a Foreign Terrorist Organization carries stigmatic and diplomatic consequences that extend well beyond Texas's borders and directly impinge on federal foreign relations prerogatives.

202. **Conflict Preemption—Impossibility of Compliance.** The Proclamation directly conflicts with federal law such that compliance with both is impossible. 8 U.S.C. § 1189 vests exclusive authority in the U.S. Secretary of State to designate Foreign Terrorist Organizations following a detailed administrative process. The federal government completed that process on January 13, 2026, and deliberately declined to designate CAIR in any capacity and declined to designate the Muslim Brotherhood as a unitary global entity. Texas's blanket designation of both entities creates an irreconcilable conflict: persons in Texas are simultaneously subject to Texas's FTO designation and the federal government's determination that these entities do not meet FTO criteria. A person cannot comply with both Texas's prohibition on 'promoting or aiding' designated entities and the federal government's determination that no such designation applies. *See Florida Lime & Avocado Growers, Inc. v.*

*Paul*, 373 U.S. 132, 143 (1963) (conflict preemption where compliance with both state and federal law is "a physical impossibility").

203.    **Conflict Preemption—Obstacle to Federal Foreign Policy.** The Proclamation stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in 8 U.S.C. § 1189. The federal FTO scheme reflects Congress's judgment that (a) uniform national standards are essential to foreign affairs; (b) state-level designations would create chaos and inconsistent application; (c) procedural safeguards and judicial review are necessary; and (d) international relations require a single national voice. Texas's unilateral designation undermines each of these objectives: it creates a patchwork of state-level designations, provides no procedural safeguards, and interferes with the federal government's calibrated diplomatic approach to Muslim Brotherhood chapters in allied nations (Egypt, Jordan, Lebanon). *See Arizona v. United States*, 567 U.S. 387, 399 (2012) (state law preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").

204.    **Texas Usurped Federal Deliberation.** Governor Abbott's November 18, 2025 Proclamation predated President Trump's Executive Order 14362 (November 24, 2025) by six days and the federal government's substantive designations (January 13, 2026) by nearly two months. Tex. Petition ¶¶ 79, 82, 85. Texas did not fill a gap left by federal inaction—it preempted federal deliberation in a field the Constitution and federal statute assign exclusively to the federal executive. When the federal government ultimately acted, it designated only three specific foreign chapters and declined to designate CAIR in any capacity. *Id.* ¶ 85. Texas's broader, faster, evidence-free designation interferes with the federal government's calibrated diplomatic approach.

205.    The political campaign underlying the Proclamation is further evidenced by the Republican Party of Texas July 3, 2025 resolution, which characterized CAIR's advocacy for religious accommodations (halal meals, Islamic holiday recognition) as 'advancing Islamic supremacy.' This ideological framing—not criminal conduct—drove the Proclamation. Such pretextual designations interfere with the federal government's calibrated approach to Muslim Brotherhood chapters in allied nations (Egypt, Jordan, Lebanon), many of which are recognized political parties. The federal government's January 2026 decision to designate only specific foreign chapters while declining to designate CAIR reflects careful diplomatic calibration that Texas's blanket designation undermines.

206.    **No Evidentiary Basis for Designation.** Governor Abbott's press release announcing the Proclamation offers only conclusory allegations without evidentiary findings. The press release states that "the actions taken by the Muslim Brotherhood and CAIR to support terrorism across the globe and subvert our laws through violence, intimidation, and harassment are unacceptable" but cites no specific criminal conduct in Texas, no administrative record, and no judicial findings. By contrast, the federal government's January 13, 2026 designations followed a detailed interagency review process with specific evidentiary findings as to three foreign chapters only. Texas's evidence-free, blanket designation—issued six weeks before the federal government completed its substantive inquiry—interferes with the federal government's calibrated, evidence-based approach

207.    Even if Texas Penal Code § 71.01(e)'s definition of "Foreign Terrorist Organization" differs from 8 U.S.C. § 1189's definition, nothing changes. Every state cannot maintain its own terrorism designation list under a locally crafted definition. That would

result in the chaotic, inconsistent, nationally incoherent patchwork that the federal scheme was precisely designed to prevent.

208.    Even if the Proclamation addresses only "nuisances" within Texas, the field preemption analysis does not depend on the label attached to state-law remedies, it depends on whether the state is regulating in the federal field. A designation of "Foreign Terrorist Organization"—regardless of what local remedy flows from it—is the federal field.

209.    Even if the Proclamation's Transnational Criminal Organization designation under Texas Property Code § 5.254(a)(2)(A) is categorically distinct from the federal FTO regime and thus not addressed by § 1189, the Supremacy Clause preemption analysis applies to that designation independently: the federal government has occupied the field of designating which entities constitute foreign terrorist or criminal organizations whose domestic operations pose national security concerns, and Texas may not substitute its own judgment for the federal government's considered determination—made after interagency consultation and according to congressional authorization—that CAIR and the Muslim Brotherhood chapters in question do not qualify, and that CAIR does not qualify at all, for any designation.

210.    **Field Preemption—Alternative Theory.** Even if conflict preemption does not apply, federal law occupies the entire field of foreign terrorist organization designations. Congress has established a comprehensive regulatory scheme in 8 U.S.C. § 1189 that leaves no room for supplementary state regulation. The scheme includes: (a) exclusive designation authority in the Secretary of State; (b) detailed criteria for designation; (c) notice and hearing requirements; (d) administrative record development; (e) judicial review in the D.C. Circuit. This pervasive framework reflects Congress's judgment that no room remains for state-level

parallel regimes. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (field preemption where federal regulation is 'so pervasive . . . that Congress left no room for the States to supplement it'). While field preemption is disfavored, it applies where Congress has unmistakably occupied a field—and foreign affairs is the quintessential federal domain. *See United States v. Texas*, 599 U.S. 670, 686 (2023) (immigration and foreign affairs are exclusive federal concerns).

211. **Federal Non-Designation Is Preemptive.** The federal government's deliberate choice not to designate CAIR is as preemptive as an affirmative designation would be. When the executive branch completes the § 1189 process and declines to designate an entity, that determination occupies the field and precludes contradictory state-level designations. *See Crosby v. National Foreign Trade Council*, 530 U.S. 363(2000) (state sanctions preempted where they undermine federal foreign policy discretion). Texas's designation of CAIR as a terrorist organization directly overrides the federal government's considered determination that CAIR does not meet FTO criteria. This is not a case of state law supplementing federal law—it is a case of state law contradicting federal law.

212. As a direct and proximate result of the Proclamation's preempted designations, Mr. Wallace has suffered and continues to suffer irreparable injury to his First Amendment-protected professional activities, his ongoing co-counsel relationships with Designated Entities in several active federal cases (¶¶ 28-32), his intended First Amendment activities during his September 2026 stay in Austin, Texas (¶ 40), and the viability of his ongoing civil rights practice. The Proclamation's preempted designations create legal uncertainty and enforcement risk for his entire professional practice. These injuries flow directly from Defendants' continued enforcement of a Proclamation that is void as preempted federal law.

Mr. Wallace respectfully requests that this Court declare the Proclamation preempted by federal law and permanently enjoin Defendants from enforcing, implementing, or giving any legal effect to the designations contained therein.

**COUNT VI**
**42 U.S.C. § 1983**
**INTERSTATE COMMERCE CLAUSE**

213.    Mr. Wallace realleges and incorporates by reference paragraphs 1-130 above.

214.    The right to interstate travel is a fundamental constitutional right protected by the Dormant Commerce Clause and the Privileges and Immunities Clause.

215.    The Proclamation substantially burdens interstate commerce and the right to travel in several ways.

216.    Mr. Wallace's ability to travel to Texas to represent clients in Palestinian, Arab, and Muslim communities; conduct litigation on their behalf; engage in professional work related to his civil rights practice; and write, demonstrate, agitate, teach, hold conferences, picket the Texas State Capitol, and otherwise publicly challenge this unlawful Proclamation, is restricted.

217.    His ability to maintain a professional presence in Texas (office, property, meeting space, etc.) for purposes of representing clients who may be characterized as "affiliates" or "members" of Designated Entities is restricted.

218.    His ability to engage in protected speech and association in Texas concerning the Muslim Brotherhood, CAIR, Palestinian rights, and related topics is restricted.

219.    Exposing attorneys to criminal and civil liability for representing clients in disfavored communities or engaging in advocacy on disfavored topics creates an artificial barrier to commerce and professional services.

220.    Proscribing activity—advocacy, association, and speech concerning the Muslim Brotherhood, CAIR, and Palestinian rights—that is lawful in all neighboring states and throughout the United States also burdens interstate commerce and the right to travel.

221.    The burden on interstate commerce is severe and unwarranted because (a) No safety or protectionist justification exists for deterring attorneys and advocates from engaging with Palestinian, Arab, and Muslim communities on issues related to the Muslim Brotherhood or CAIR—activity that remains lawful in all other states; (b) Texas has not demonstrated that the Muslim Brotherhood or CAIR poses a credible threat to Texas security warranting restrictions on interstate professional activity; (c) The federal government's deliberate choice not to designate the Muslim Brotherhood at the national level suggests no serious national security threat justifying Texas's independent action; (d) The burden falls disproportionately on out-of-state actors (including Mr. Wallace) and non-residents attempting to travel to Texas or conduct professional business there.

222.    Even if a legitimate state interest existed, the Proclamation is not narrowly tailored because (a) Less restrictive alternatives exist, including prosecution of actual criminal activity under existing Texas and federal law; (b) The federal government has already established comprehensive procedures for addressing foreign terrorism under 8 U.S.C. § 1189; and (c) A blanket designation that sweeps in all "affiliates," "members," and persons "promoting or aiding" the Designated Entities is massively overinclusive, capturing protected speech, association, and professional services.

223.    To the extent Texas law purports to restrict interstate commerce through the land-ownership ban, enforcement provisions, and chilling of professional services, it is preempted and invalid under the Interstate Commerce Clause.

## COUNT VII
### 42 U.S.C. § 1983
#### FIRST, FIFTH, AND FOURTEENTH AMENDMENTS
**(Right to Obtain Counsel)**

224.    Mr. Wallace realleges and incorporates by reference paragraphs 1-130 above.

225.    Arab and Muslim individuals, students, faculty, employees, and organizations in Texas and throughout the nation have a constitutionally protected liberty interest in retaining counsel of their choice to vindicate their rights. This right applies in civil proceedings as well as criminal ones, because the Constitution protects the right to have the assistance of counsel in proceedings that may deprive a person of liberty or property interests protected by the Fifth and Fourteenth Amendments. The attorney-client relationship is also a site of independent First Amendment protection: collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment.

226.    The Proclamation unconstitutionally infringes the right of Arab and Muslim individuals and organizations to obtain legal counsel by designating as a "terrorist organization" the co-counsel with whom Mr. Wallace and other civil rights attorneys jointly represent them. By branding CAIR—a prominent Muslim civil rights organization that currently serves as co-counsel in dozens of active federal cases—a foreign terrorist organization, the Proclamation coerces attorneys to abandon their co-counsel relationships with CAIR and coerces clients to sever their attorney-client relationships with attorneys who maintain professional relationships with CAIR, or risk being treated as persons "promoting or aiding" a terrorist organization. This coercive suppression of attorney-client relationships violates the First Amendment. Government officials cannot attempt to coerce private parties to punish or suppress views that the government disfavors. The Proclamation also violates

the due process liberty interests of Arab and Muslim clients who are thereby denied access to legal representation of their choosing in vindication of their constitutional rights.

227.    Mr. Wallace brings this Count to vindicate his own constitutional rights and his own attorney-client relationships. He does not assert third-party standing on behalf of clients.

228.    The Proclamation therefore violates the First, Fifth, and Fourteenth Amendments as applied to the attorney-client relationships of Arab and Muslim clients who seek legal representation in connection with matters implicating CAIR and Muslim Brotherhood designations, and as applied to Mr. Wallace's ongoing representation of those clients.

## VIII.    IRREPARABLE HARM, BALANCE OF EQUITIES, AND PUBLIC INTEREST

229.    Mr. Wallace and individuals in the Palestinian, Arab, and Muslim communities targeted by the Proclamation face irreparable harm for several reasons.

230.    First, chilled First Amendment rights cannot be fully compensated by damages—how does one calculate the value of speech never uttered, advocacy never pursued, or legal representation never provided to clients in need?

231.    Second, reputational injury from association with state-designated "terrorist" and "criminal" organizations is permanent and irreversible—the stigma attaches immediately and persists regardless of the designation's ultimate validity.

232.    Third, property seizure under divestiture proceedings is immediately destructive—once property is divested, the harm cannot be undone through subsequent litigation.

233.    Fourth, criminal prosecution under Texas Penal Code Chapter 71 exposes Mr. Wallace to imprisonment and the destruction of his license to practice law—consequences that cannot be remedied by damages even when he ultimately prevails. While criminal prosecutions under Chapter 71 must be brought by district or county attorneys rather than the Attorney General, the Proclamation's designation creates the predicate for such prosecutions and chills Mr. Wallace's conduct through that credible threat. The February 5, 2026 Attorney General enforcement lawsuit demonstrates that the enforcement apparatus is actively operating. *See Book People, Inc.*, 91 F.4th at 335 (demonstrated willingness to exercise enforcement authority satisfies *Ex parte Young*).

234.    Finally, ongoing enforcement creates a continuing chill that damages Mr. Wallace's practice and professional relationships—clients in targeted communities are deterred from seeking representation, and colleagues are deterred from associating with his practice.

235.    The balance of equities strongly favors preliminary and permanent injunctive relief because Texas remains fully authorized to prosecute any actual criminal conduct under existing Texas Penal Code provisions—the injunction would not impair legitimate law enforcement.

236.    Additionally, the federal government retains exclusive authority under 8 U.S.C. § 1189 to designate foreign terrorist organizations when it determines such designations are warranted—Texas need not fill any gap in federal enforcement.

237.    The injunction would also prevent only the unlawful state-level parallel designation and its enforcement mechanisms, not prosecution of genuine criminal activity;

238.    The harm to Defendants from enjoining enforcement of an unconstitutional proclamation is nonexistent as they have no legitimate interest in enforcing unconstitutional restrictions. Conversely, the harm to Mr. Wallace from continued enforcement is severe and irreparable.

239.    Defendants face no cognizable injury from being prevented from violating the Constitution.

240.    The public interest is strongly served by (a) Upholding constitutional protections against viewpoint discrimination, religious targeting, and First Amendment infringement; (b) Preventing arbitrary and discriminatory governmental action based on religious animus and ideological disagreement; (c) Maintaining a coherent and federally controlled foreign-terrorism designation scheme that Congress, the Executive Branch, and the courts have carefully established to balance national security with civil liberties; (d) Protecting the integrity of the legal profession by ensuring that attorneys can represent clients of their choice—including clients in disfavored communities—without fear of state prosecution or professional destruction; and (e) Preventing erosion of separation of powers and federalism by ensuring states do not arrogate to themselves authority over foreign affairs and terrorism designations that the Constitution reserves to the federal government.

## IX.    PRAYER FOR RELIEF

Plaintiff Jonathan Wallace requests that this Court:

A.    Issue an injunction requiring Defendant Abbott to rescind the November 18, 2025 Proclamation's designations of the Designated Entities as Foreign Terrorist Organizations under Tex. Penal Code § 71.01(e) and as Transnational Criminal Organizations under Tex. Prop. Code § 5.254(a)(2)(A), or alternatively to take no further steps

to give effect to those designations, for so long as this action is pending and until final judgment.

B. Declare that the November 18, 2025 Proclamation designating the Muslim Brotherhood and CAIR as "Foreign Terrorist Organizations" and "Transnational Criminal Organizations" under Texas law is unconstitutional and void on its face and as applied, in violation of the First Amendment, the Fourteenth Amendment (Due Process Clause), the Fourteenth Amendment (Equal Protection Clause), the Bill of Attainder Clause, the Supremacy Clause, and the Interstate Commerce Clause.

C. Declare that Defendants' enforcement of the Proclamation violates Mr. Wallace's First and Fourteenth Amendment rights.

D. Immediately enjoin and restrain Defendants, their officers, employees, and agents, and all persons acting in concert with them, from:

- Enforcing, implementing, or otherwise giving effect to the Proclamation's designations of the Muslim Brotherhood and CAIR as "foreign terrorist organizations" or "transnational criminal organizations;"

- Treating the Muslim Brotherhood, CAIR, or any person alleged to be an "affiliate," "member," or "person promoting or aiding" their activities as a "foreign terrorist organization" or "transnational criminal organization" by virtue of the Proclamation;

- Initiating, pursuing, or maintaining any nuisance action, divestiture action, civil penalty action, or criminal prosecution based on those designations;

- Referring any person to criminal investigation based on alleged association with the Muslim Brotherhood or CAIR pursuant to the Proclamation;

- Maintaining or updating any criminal intelligence database entry based on the Proclamation;

- Otherwise giving effect to the Proclamation in any respect;

E.     Order Defendants to rescind the Proclamation and remove it from public websites, records, and state communications.

F.     Award Mr. Wallace reasonable attorneys' fees and costs under 42 U.S.C. § 1988,[29] the Texas Administrative Code, and other applicable authority.

G.     Additionally or in the alternative, (a) Enjoin Attorney General Paxton from initiating or pursuing any civil enforcement action under Property Code Subchapter H or Chapter 125 based on the Proclamation's designations; (b) Enjoin DPS Director Martin from maintaining or updating any criminal intelligence database entry based on the Proclamation; (c) Declare the Proclamation unconstitutional and void as to all enforcement mechanisms within the substituted officials' authority.

H.     Award such other and further relief as this Court deems just, proper, and necessary to remedy the constitutional violations alleged herein.

## X.     RESERVATION OF STATE LAW CLAIMS

Plaintiff does not in this complaint assert any claim based on the Texas Administrative Procedure Act, Tex. Gov't Code Ch. 2001, or on Articles I or II of the Texas Constitution. Federal courts may not order state officials to comply with state law in a federal proceeding. The omission of these claims from this Complaint does not reflect an abandonment of those claims or an admission that they lack merit. Mr. Wallace expressly reserves the right to assert

---

[29] For purposes of attorney's fees, Mr. Wallace invokes 42 U.S.C. § 1988 insofar as this action is functionally equivalent to a § 1983 claim for fee-shifting purposes, or alternatively invokes this Court's inherent equitable authority to award fees where Defendants have acted in bad faith.

all claims under the Texas APA, the Texas Constitution, and any other Texas law arising from the issuance of the Proclamation in a proceeding in a court of competent state jurisdiction.

## XI.    JURY DEMAND

Mr. Wallace demands a jury trial on all claims triable to a jury.

Respectfully submitted,

_____/s/Abdel-Rahman Hamed_____          _____/s/ Jonathan Wallace_____
ABDEL-RAHMAN HAMED, ESQ.                     JONATHAN WALLACE, ESQ. *
TXWD Bar No. 1632130                         NY Bar No. 1733757
**Hamed Law**                                P.O. Box 728
P.O. Box 25085                               Amagansett, NY 11930
Washington, D.C. 20027
                                             (917) 359-6234
(202) 888-8846
                                             jonathan.wallace80@gmail.com
Advocates@HamedLaw.com

*Attorneys for Plaintiff Jonathan Wallace*

*\*Admitted pro hac vice*